**FEDERAL TRADE COMMISSION,**
Petitioner,

v.

**COMPAGNIE DE
SAINT–GOBAIN–PONT–A–MOUSSON,**
Respondent.

Misc. No. 78–0194.

United States District Court,
District of Columbia.

Feb. 14, 1980.

David M. Fitzgerald, F.T.C., Washington, D.C., for petitioner.

Miles W. Kirkpatrick, Washington, D.C., Thomas A. Masterson, Philadelphia, Pa., for respondent; Charles W. Smith, Joseph M. Gensheimer, Robert A. Lipstein, Morgan, Lewis & Bockius, Washington, D.C., John T. Synnestvedt, Ernest G. Szoke, John S. Child, Jr., Synnestvedt & Lechner, Philadelphia, Pa., of counsel.

MEMORANDUM

OBERDORFER, District Judge.

On June 8, 1978, the Federal Trade Commission (FTC) petitioned for a court order requiring a French corporation, Compagnie de Saint-Gobain-Pont-a-Mousson (SGPM), to produce documents. The documents were the subject of FTC subpoenas served in 1977 on apparent agents of SGPM in the United States and by registered mail to SGPM's corporate headquarters in Paris.

The subpoenas were issued pursuant to an FTC resolution to use "all compulsory processes available" to it in connection with an investigation of SGPM, CertainTeed Corporation (a subsidiary of SGPM), Owens-Corning Fiberglass Corporation, Johns Manville Corporation and others engaged directly or indirectly in the sale of insulation.[1] The investigation was to determine, among other things, whether those named were engaging or had engaged in acts or practices violative of Section 5 of the Federal Trade Commission Act, including those relating to licensing of patents, the exchange and availability of technology and know-how, the availability and practice of raw materials and the allocation and distribution of insulation products and textile fiberglass.

---

1. On September 22, 1977, the Commission, after denying a motion to quash, filed by SGPM's Washington counsel, issued the subpoena so authorized and caused it to be delivered by hand to the Washington attorney and to the New York office and residence of SGPM's General Delegate in the United States. The General Delegate in the United States is one of eleven "delegates general" serving SGPM worldwide. A certificate attached to respondent's brief in the Court of Appeals listed 79 corporations in 17 countries, including the United States, as subsidiaries of SGPM. Although the SGPM General Delegate is appointed by the President Director General of SGPM and serves at his pleasure, he is not elected by the SGPM Board of Directors and his authority is confined to the country in which he serves. It is his "function . . . to oversee, as directed by the President [Director] General, the interests of SGPM in the country . . . to which he is assigned, and to provide SGPM with information concerning the prevailing economic and political conditions in such country . . . .." Affidavit of Paul Duquesne, General Counsel of SGPM, executed in Paris, June 30, 1978, filed July 5, 1978, at ¶ 5.

On June 9, 1978, Judge Thomas Flannery, as Motions Judge in this District, issued an order to SGPM to show cause before July 14, 1978, why the FTC's petition should not be granted. Judge Flannery's order further directed the Clerk of this Court to serve copies of the FTC petition and supporting documents upon SGPM:

> forthwith . . . by any form of mail requiring a signed receipt, in accordance with Fed.R.Civ.P. 4(i)(1)(D), and by the United States Marshal by delivery to Gabriel Aufaure or the individual in charge of the Offices of Saint Gobain, Inc., 551 Fifth Avenue, New York, N.Y. 10017, as agent for respondent. Service shall be deemed to have occurred when either method of service has been effected.

On June 9, 1978, a deputy clerk mailed a copy of the Petition and Order to the following named respondent:

> Compagnie De Saint-Gobain-Pont-a-Mousson
> 54, Avenue Hoche
> Paris, France 75365

A return receipt posted in Paris on June 12, 1978, and filed by the Clerk on June 20, 1978, evidenced respondent's receipt of Judge Flannery's order to show cause.[2]

---

SGPM responded to the subpoena so served by another motion to quash which the Commission granted in part and denied in part on February 17, 1978. Thereafter, representatives of the FTC and SGPM met to refine the Commission's subpoena demands. While carefully preserving its objections to the subpoena, SGPM counsel stated its willingness to assist the Commission in reaching reasonable solutions to the demands of the FTC. The parties were unable to reach agreement on the time period covered by the subpoenas, and this suit followed. *See* Answer, *infra* at 291–292.

2. SGPM filed a July 5, 1978, Answer to the petition together with a supporting memorandum. The Answer stated, among other things, that the Commission's 1977 subpoena was "issued," but not "properly 'served.'" Respondent Compagnie De Saint-Gobain-Pont-A-Mousson's Answer to Petition, etc., July 5, 1978, at ¶ 8 [hereinafter "Answer"]. In "clarification" of averments in the FTC petition, respondent stated that: SGPM is a corporation existing under the laws of France, with headquarters in Paris. Its formation resulted from a 1970 merger of Compagnie de Saint Gobain

Judge Flannery's order to show cause was heard by this Court as a motions matter in July, 1978. At that time, SGPM raised objections both to the breadth of the subpoenas and the methods by which they were served. In brief, SGPM asserted that the modes of service the FTC employed were not authorized by statute and, accordingly, that SGPM was not required to comply with the subpoenas. SGPM did not contest jurisdiction of the Court or service of the order to show cause pursuant to Rule 4(i), Fed.R.Civ.P. The Court rejected the challenges to service, focussing instead on the design of a discovery program appropriate to the needs of the FTC and the correlative burden upon SGPM. *See FTC v. Texaco, Inc.*, 180 U.S.App.D.C. 390, 555 F.2d 862 (en banc), *cert. denied*, 431 U.S. 974, 97 S.Ct. 2940, 53 L.Ed.2d 1072 (1977). After a further hearing in the form of a conference with counsel, the FTC filed a Statement of Intent that met those SGPM claims of burden that had concerned the Court. Accordingly, on October 2, 1978, the Court found that service of the subpoena was proper and that the subpoena, as modified, was within the authority of the FTC and relevant to its

inquiry. Believing that SGPM had received all the relief from burden to which it was entitled and that its protests on the form of service were without merit, the Court denied SGPM's motion for a stay pending appeal. Thereupon, SGPM appealed.

On November 26, 1979, after brief and argument, the Court of Appeals remanded the Order of October 2. *FTC v. Compagnie De Saint-Gobain-Pont-a-Mousson*, No. 78–2160 (D.C.Cir. Nov. 26, 1979). The Court of Appeals found that three of the four modes of service attempted by the Commission were not effective. Slip Op. at 2 n. 2. In remanding the case, the Court of Appeals directed this Court to consider the effectiveness of the service by registered mailing to SGPM corporate headquarters in Paris. The Court noted that:

> Resolution of that issue will involve construction of the relevant authorizing statutes and determination of the congressional intent in enacting them. Relevant in this regard will be whether the construction adopted would be in conformity with general principles of international law, since Congress is customarily presumed, unless a plain intention appears to

(SG) and Pont-a-Mousson. According to the answer, neither SG nor SGPM "ever manufactured insulation products in the United States." Answer at 3. From 1967 until 1971, SG and a United States Corporation, CertainTeed Products Corporation (CertainTeed), were parties to a joint venture "for the manufacture and sale of fiberglass insulation in the United States." *Id.* In 1971, SGPM and CertainTeed "dissolved" the joint venture and SGPM "took a direct interest in" CertainTeed. *Id.* In the same year, SGPM "transferred its United States patents for the manufacture of insulation products and fibeglass strand" to Certain-Teed. *Id.* At an unstated time "thereafter," *id.*, SGPM "increased its ownership in" CertainTeed (by an unstated amount). *Id.* In any event, SGPM currently owns "approximately 54 percent of the voting stock" of CertainTeed. *Id.*

Paragraph 3 of the "clarification, *id.* at 3–4, states that:
a. Outside the United States, SG (since 1971 SGPM) has over the years established subsidiaries, entered into joint ventures, and otherwise become affiliated with companies that manufacture and/or sell fiberglass insulation or strand in many parts of the world.

b. There are currently, for example, SGPM group companies or joint ventures located in Austria, Belgium, Brazil, France, Germany, Greece, Italy, Japan, Spain, Sweden, Switzerland, The United Kingdom, and the United States that are engaged in the manufacture and/or sale of fiberglass insulation or strand.
c. For a number of reasons, chief among which is its huge bulk and low density per dollar in value, it is not and never has been a normal commercial practice to transport fiberglass insulation over long distances.
d. No United States insulation manufacturer, including [CertainTeed], has exported fiberglass insulation overseas.
e. Until 1977 none of the SGPM group companies, affiliates, or joint ventures located outside the United States shipped fiberglass insulation manufactured abroad into the United States.
f. Beginning in 1977, as a result of the energy crisis and the depressed economic conditions in France (which resulted in under-utilized plant capacity), fiberglass insulation manufactured by an SGPM group company in France has been shipped to the United States as an interim measure.

the contrary, to avoid conflict with such principles as well as the Constitution. Slip Op. at 2.

After argument on remand, FTC counsel filed a note from the French Embassy to the State Department, which was transmitted to the FTC through the State Department. The note, dated January 10, 1980, informed the Department of State that:

the transmittal by the FTC of a subpoena directly by mail to a French company (in this case Saint-Gobain-Pont-a-Mousson) is inconsistent with the general principles of international law and constitutes a failure to recognize French sovereignty.

According to the note, "response to certain of the requests from the FTC" could expose SGPM directors to civil and criminal liability and therefore expose them to "judicial proceedings" in France. The note expressed the wish of the French Government that the Department advise the FTC and, presumably, the Court "that the French Government wishes such steps, both in this matter and any others which may subsequently arise, to be taken solely through diplomatic channels."

■ In carrying out the mandate of the Court of Appeals, this Court has reviewed the relevant authorizing statutes and court decisions relating to the FTC and international law in the context of the events that have transpired in this already protracted matter. This reflection compels the conclusion that neither the framers of the Constitution, who empowered Congress to regulate interstate and foreign commerce, nor the Congress, which authorized the FTC to police it and provided administrative and judicial powers for that purpose, intended to deny the FTC the right to send a subpoena by mail to a foreign corporation suspected, along with its U.S. subsidiary and other major U.S. corporations, of unfair trade practices in violation of the Federal Trade Commission Act. Accordingly, an Order accompanying this Memorandum will reiterate the Court's Order of October 2, 1978, directing its service pursuant to Rule 4(i), Fed.R.Civ.P. The stay imposed on January 14 by the Court of Appeals expires upon the filing of this Order and Memorandum. To permit SGPM a prompt appeal and to enable the Court of Appeals to scrutinize any comment by the Department of State to the French note, or any further comment by the Government of France to the issues addressed herein, the effective date of the Order will be postponed for 30 days.

I

A.

■ At the outset, it should be noted that the mandate of the Court of Appeals addresses a narrow issue: whether Section 9 of the Federal Trade Commission Act, 15 U.S.C. § 49, authorizes foreign service of process by registered mail. There is no question that the FTC has the authority to investigate the conduct of foreign corporations affecting the foreign or interstate commerce of the United States or that SGPM, by its conduct, falls within the FTC's jurisdiction. Nor, as the Court of Appeals noted, is there any dispute over the authority of the FTC lawfully to subpoena documents located abroad. Slip Op. at 1. Additionally, neither party disputes that whatever the accepted standard of international law, Congress may, and on occasion has, authorized foreign service of process by mail.

The issue before the Court is principally one of statutory construction in the face of a legislative history that both parties agree is wholly silent on the question of service. The FTC asserts that a construction of Section 9 that limits the authority of the Commission to service only within the United States would be inconsistent with the purposes and scope of the Act taken as a whole, and, accordingly, should be avoided. SGPM maintains that the statute expressly limits service of process to the United States. Moreover, it asserts that because principles of international law generally condemn foreign service of process by mail, authority for such service should never be found in the absence of congressional intent clearly and unambiguously manifested. SGPM contends that no such demonstration of con-

gressional intent can be found in the terms or history of the Federal Trade Commission Act.

### B.

■ Article I, Section 8, Clause 3 of the U.S. Constitution provides that:

> The Congress shall have power . . . to regulate commerce with foreign Nations, and among the several States, and with the Indian Tribes.

In *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 83, 6 L.Ed. 23 (1824), Chief Justice Marshall stated:

> The subject to be regulated is commerce . . . .. The counsel for the appellee would limit it to traffic, to buying and selling, or the interchange of commodities . . . .. This would restrict a general term, applicable to many objects, to one of its significations. Commerce, undoubtedly, is traffic, but it is something more—it is intercourse.

Or, as stated by the Supreme Court of another later era:

> Transactions . . . [may] be commerce . . . though they do not utilize common carriers or concern the flow of anything more tangible than electrons and information.

*United States v. South-Eastern Underwriters Assn.*, 322 U.S. 533, 549–550, 64 S.Ct. 1162, 1172, 88 L.Ed. 1440 (1944). Nor has the Supreme Court been niggardly in defining Congress' power to regulate. Chief Justice Marshall declared in *Gibbons*, 22 U.S. at 86:

> What is this power? It is the power to regulate, that is to prescribe the rule by which commerce is to be governed. This power, like all others vested in congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution . . . .. If, as has always been understood, the sovereignty of congress, though limited to specified objects, is plenary as to those objects, the power over commerce with foreign nations, and among the several states, is vested in congress as absolutely as it would be in a single government, having

in its constitution the same restrictions on the exercise of the power as are found in the constitution of the United States. The power of Congress to regulate foreign commerce is as great, if not greater, than its power to regulate interstate commerce. It was long ago established that:

> The power to regulate commerce among the several states is granted to Congress in the same clause, and by the same words, as the power to regulate commerce with foreign nations, and is coexistive with it.

*License Cases*, 46 U.S. (5 How.) 504, 578, 12 L.Ed. 256 (1847).

### C.

The Federal Trade Commission Act, 15 U.S.C. § 45(a)(1), declared "[u]nfair methods of competition in or affecting commerce, and unfair . . . acts or practices in or affecting commerce" to be unlawful. In the Act, Congress empowered the FTC "to prevent persons, partnerships, or corporations . . . from using [such] acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(2). The act defined "commerce" to mean "commerce among the several states or with foreign nations." 15 U.S.C. § 44. Additional powers of the Commission include the gathering and compiling of information concerning and the investigation "from time to time" of "the organization, business, conduct, practices and management of any person, partnership or corporation engaged in or whose business affects commerce . . . and its relation to other persons, partnerships and corporations." 15 U.S.C. § 46(a). The Commission is further authorized:

> To investigate, from time to time trade conditions in and with foreign countries where associations, combinations, or practices of manufacturers, merchants or traders, or other conditions may affect the foreign trade of the United States, and to report to Congress thereon, with such recommendations as it deems advisable.

15 U.S.C. § 46(h).

■ When Congress passed the Federal Trade Commission Act, it exercised a full

measure of its constitutional power to regulate commerce. According to the Supreme Court:

> All of the committee reports and the statements of those in charge of the Trade Commission Act reveal an abiding purpose to vest both the Commission and the courts with adequate powers to hit at every trade practice, then existing or thereafter contrived, which restrained competition or might lead to such restraint if not stopped in its incipient stages.

*F.T.C. v. Cement Institute*, 333 U.S. 683, 693, 68 S.Ct. 793, 799, 92 L.Ed. 1010 (1948). The Court went on to observe, in terms singularly appropriate to a three-year subpoena enforcement proceeding:

> We can conceive of no greater obstacle this Court could create to the fulfillment of these Congressional purposes than to inject in every Trade Commission proceeding brought under § 5 . . . a possible jurisdictional question.

333 U.S. at 693, 68 S.Ct. at 799–800. And the Court there prophetically anticipated contentions like those advanced by SGPM here when it observed:

> The fact that one or two of the numerous participants in the combination happen to be selling only within the borders of a single state is not controlling . . . . The important factor is that the concerted action of all of the parties to the combination is essential in order to make wholly effective the restraint of commerce among the states. The Commission would be rendered helpless to stop unfair methods of competition in the form of interstate combinations and conspiracies if its jurisdiction could be defeated on a mere showing that each conspirator had carefully confined his illegal activities within the borders of a single state. .

*Id.* at 696, 68 S.Ct. at 801.

Congress gave the FTC broad subpoena powers to carry out its regulatory function, and made the district courts available to "aid" the FTC. 15 U.S.C. § 49. Section 9 of the Trade Commission Act, 15 U.S.C. § 49, confers directly upon the Commission, "at all reasonable times . . . access to, for the purpose of examination, and the right to copy any documentary evidence of any . . . corporation being investigated or proceeded against . . . ." In addition (the statute uses the word "and"):

> [T]he Commission shall have power to require by subpoena the attendance and testimony of witnesses and the production of all such documentary evidence relating to any matter under investigation.

15 U.S.C. § 49.

A further paragraph of Section 9 provides that:

> production of such documentary evidence may be required from any place in the United States, at any designated place of hearing.

## II

### A.

▇ Partial answer to the Court of Appeals' inquiry is apparent from the face of the relevant authorizing statutes defining the FTC's mission and arming it and the courts aiding it with powers to investigate, compel evidence, and make and enforce orders. The statutes are to be read "as an integrated whole." *See United States v. Morton Salt Co.*, 338 U.S. 632, 650, 70 S.Ct. 357, 367, 94 L.Ed. 401 (1950). As a whole, they grant, and the Courts have construed them as granting, the broadest power to make commerce, foreign and domestic, fair. *See FTC v. Cement Institute*, 333 U.S. at 689–695, 68 S.Ct. at 797–800. It seems beyond reasonable dispute that the FTC could not faithfully execute its congressional mandate to investigate and enforce laws regulating foreign and domestic commerce if its process could not reach companies incorporated and headquartered abroad which nevertheless have substantial and continuing impacts on the foreign and domestic commerce of the United States.

In construing subpoena authority identical to that of the FTC, the Courts have consistently held that the agencies' fulfill-

ment of their statutory duties should not be frustrated by reading into the statute artificial limits on the investigatory power of the agencies. *See CAB v. Deutsche Lufthansa Aktiengesellschaft*, 192 U.S.App. D.C. 342, 591 F.2d 951 (1979); *FMC v. DeSmedt*, 366 F.2d 464, 470 (2d Cir.), *cert. denied*, 385 U.S. 974, 87 S.Ct. 513, 17 L.Ed.2d 437 (1966); *SEC v. Minas De Artemisa*, 150 F.2d 215 (9th Cir. 1945). Specifically, these courts addressed the question of whether statutory language (identical to that found in 15 U.S.C. § 49) stating that the "attendance of witnesses, and the production of such documentary evidence, may be required from any place in the United States, at any designated place of hearing," limits the agencies' authority to compel the production of documents located abroad. In each case, the courts ruled that the terms "from any place in the United States" did not limit the agencies' authority. As the Ninth Circuit noted in *Minas De Artemisa*:

Congress having clothed the [SEC] with broad investigatory powers, [a court] should be slow to impute to it the purpose of creating a loophole for companies incorporated abroad but which, like [the] appellee, are actively doing business and peddling their securities in the United States.

150 F.2d at 218.

SGPM has argued before this Court that although the terms "from any place in the United States" do not, concededly, limit the authority of an agency to subpoena documents located abroad, they do limit the range of service. However, as Judge Friendly conclusively established in *DeSmedt*, these terms should not be read in any way to limit an agency's ability to compel the production of documents or the presence of witnesses.[3]

■ The language in question was added to the Interstate Commerce Act, 49 U.S.C. § 12, in 1891 to clarify the power of the ICC to require attendance of witnesses beyond the judicial districts of their residence. *See FMC v. DeSmedt*, 366 F.2d at 470–71. The ICC's subpoena authority has been copied in the FTC Act and many other statutes authorizing administrative subpoenas. 366 F.2d at 471 n. 12. The inclusion of the terms in the statute had the "plain purpose" of expanding the subpoena authority of agencies, not to "thwart it." 366 F.2d at 471. As our Court of Appeals explained in *Lufthansa* in expressly adopting Judge Friendly's opinion:

[T]he pertinent statutory provision . . . was not intended as a limitation on agency subpoena authority, but rather was intended to free the agency of the geographic limitations imposed on subpoenas issued by district courts.

192 U.S.App.D.C. at 344, 591 F.2d at 953.

■ In the presence of the FTC's broad authority to investigate and to regulate foreign and inter-state commerce, the power to serve its process abroad may be inferred. In *Blackmer v. United States*, 284 U.S. 421, 52 S.Ct. 252, 76 L.Ed. 375 (1932), where the issue involved service in France of a subpoena commanding an American citizen residing in Paril to appear at a criminal trial in the United States, the Supreme Court unequivocally concluded that the lawful exercise of jurisdiction confers the authority to effect service. The Court held that authority to issue the subpoena:

necessarily implies the authority to give him notice of the requirement. As his attendance is needed in court, it is appropriate that the Congress should authorize the court to direct the notice to be given and that it should be in the customary form of a subpoena. Obviously, the requirement would be nugatory, if provision could not be made for its communi-

---

3. The Ninth Circuit in *Minas De Artemisa* does suggest that to be effective, a subpoena under the statutory language here at issue must be served "within the territorial limits of the United States." 150 F.2d at 218. The Court's proviso is *dictum*, service in *Minas De Artemisa* having been made in the United States, and is inserted without explanation. Although Judge Friendly nowhere addresses the issue of service in *DeSmedt*, his careful and scholarly analysis and conclusions are inconsistent with the Ninth Circuit's conclusion by way of *dictum*. The Court concludes that the better approach is that identified by Judge Friendly.

cation to the witness in the foreign country.

284 U.S. at 438, 52 S.Ct. at 255.[4]

It would thus require strong evidence, which is not apparent either from the face of the statute or its legislative history, for the Court to find that Congress intended to render the FTC powerless to compel the production of documents relevant to a lawful inquiry simply because a foreign company actively doing business here is careful enough to keep its corporate headquarters and its officers and directors abroad. *See FMC v. DeSmedt*, 366 F.2d at 469.

### B.

■ SGPM nevertheless argues that the strong presumption in favor of authorizing service should be reversed in this instance because of prevailing principles of international law. SGPM has offered the affidavits of experts on international law that: (1) issuance of the FTC subpoena was a sovereign act of the United States; (2) the 1965 Convention on the Service of Process Abroad does not sanction service by a government agency; (3) the French Government has specifically announced its intention not to facilitate pretrial discovery originating in other countries; and (4) "many" international law experts share the opinion that direct service of process by one state into the territory of another is, in every instance, contrary to international law. Because of the alleged gravity of the breach of international law generated by

foreign mail service, SGPM contends that clear Congressional intent to authorize foreign mail service must be apparent. Both parties concede that in this instance, no such express manifestation of Congressional intent is present.

The Court finds no occasion in these circumstances to imply a requirement of "clear statement." First, in numerous instances, Congress has authorized service of process abroad.[5] Yet nowhere in these statutes or their legislative histories can the Court find the sort of explicit statement of intent that SGPM contends is necessary here. Nor does examination of Congress' actions reflect any deletion of its authorizations for service of process abroad in deference to international law concepts about the proprieties of service. For example, Rule 4(i), Fed.R.Civ.P., authorizes service abroad by mail; it was ratified, not by a clear statement of Congressional intent, but by silent ratification of the rule proposed by the Supreme Court in 1963, which Congress could have refused to approve. Similarly, Congress has made no effort to interdict state statutes authorizing service of process abroad by mail, *see, e. g.*, Michigan General Court Rule 105.9, or to overturn court decisions finding an implied statutory authorization to serve process abroad. *See, e. g., Zenith Radio Corp. v. Matsushita Electric Industries*, 402 F.Supp. 262, 329–30 (E.D.Pa. 1975); *SEC v. Myers*, 285 F.Supp. 743, 747–48 (D.Md.1968); *see generally* 2 Moore, Federal Practice ¶ 4.45 (2d Ed. 1979).[6] Most

---

**4.** In *Blackmer* the Court was construing the authority of Congress to authorize service of process abroad, which it had done explicitly in that case. *See* 284 U.S. at 433–34, 52 S.Ct. at 253. Nevertheless, the Court finds persuasive the analogy that just as the authority of Congress to subpoena implies the authority to serve, so the delegation to the FTC of subpoena authority in this case necessarily implies a similar delegation of congressional authority to effect service. The fact that the object of the subpoena in *Blackmer* was a U.S. citizen does not alter the analysis, since the issue of citizenship in that case went only to the ability of the U.S. to exercise personal jurisdiction. *See* 284 U.S. at 436–37, 52 S.Ct. at 254. In the instant case, there is no question that by its conduct, SGPM has similarly made itself subject to personal jurisdiction in the United States.

**5.** *See, e. g.,* 8 U.S.C. § 1451(b) (actions for revocation of naturalizations); 35 U.S.C. § 146 (civil actions in patent interference cases); 35 U.S.C. § 293 (proceedings affecting patent rights where the patentee does not reside in the United States). Similarly, the Advisory Committee Note to the 1963 amendment to Rule 4, Fed.R.Civ.P., suggests that several other statutes, including 15 U.S.C. §§ 77v(a), 78aa, 79y, and 38 U.S.C. § 784(a) and Wis.Stat.Ann. § 262.06 (1957) impliedly authorize foreign service. *See* [1961] U.S.Code Cong. & Admin. News, pp. 1379, 1383.

**6.** In a situation in which the mail service provisions of Rule 4(i) were not available, this Court has authorized such service under its authority to draft local rules, Rule 83, Fed.R.Civ.P. *See*

indicative of Congress' understanding of the significance of foreign service by mail are the rules relating to service of persons *in* the United States from foreign countries. Thus, 28 U.S.C. § 1696 authorizes each district court to order service on any person in the district of "any document issued in connection with a proceeding in a foreign or international tribunal." The Senate Report stated the purpose of the statute is to provide "equitable and efficacious procedures for the benefit of tribunals and litigants involved in litigation with international aspects." S.Rep. No. 1580, 88th Cong., 2d Sess.2 (1964), U.S.Code Cong. & Admin. News 1964, pp. 3782, 3783. The Senate Report reaffirms the preexisting freedom of foreign litigants or tribunals to serve process directly within the United States without the assistance of the courts. *See id.* at 7.

Furthermore, the Court is not convinced that there are any generally applicable principles of international law regarding methods of service to which Congress might be expected to defer. SGPM has demonstrated that there is a school of international law scholars which contends that international service of process by mail demeans the sovereignty of the nation in which the process is received, contrary to international law principles. The French Government apparently shares this view and has protested the mail service of the FTC's subpoena.

But this contention is not embraced universally or even generally. *Blackmer v. United States* plainly states the view of the United States that service of a subpoena is merely a ministerial act of giving notice and not in any sense an exercise of jurisdiction. 284 U.S. at 438–39, 52 S.Ct. at 255. This view is shared by numerous authorities both in the United States, *see* Restatement (Second) of Foreign Relations Law of the United States § 44, Comment (b) (1965), and abroad, *see J. R. Geigy, AG v. EEC Commission,* [1971–73 Transfer Binder] Comm. Mkt. Rep. (CCH) ¶ 8164 (1972).[7] Moreover,

*Renchard v. Humphreys & Harding, Inc.,* 59 F.R.D. 530, 531–32 (D.D.C.1973).

Similarly, Rule 4(e), which permits service according to the rules of the state in which the district court is located, permits foreign service in a federal question matter irrespective of the provisions of Rule 4(i), if it is authorized by local statute or rule. *See United States v. First National City Bank,* 379 U.S. 378, 381–82, 85 S.Ct. 528, 530, 13 L.Ed.2d 365 (1965). Such broad delegated authority, which has the effect of expanding the service provision of a federal statute on the basis of state service rules, is plainly inconsistent with a conclusion that Congress may be said to authorize foreign mail service only where it has clearly expressed its intent to do so.

7. The facts of *J. R. Geigy* are compelling. There the recipient of a decision of the Commission of the European Communities in an antitrust proceeding sought annulment of the decision on the ground, *inter alia,* that service of the Commission's process through the mails to Switzerland offended principles of international law. In rejecting this contention, the Court stated:

The documents indicate that the authorities of [Switzerland] do not at the present time recognize that there is any way in practice to give notice in the territory of that country in a manner that they consider valid under national law. Hence, international law cannot be invoked to deny the Community the power to do whatever is necessary to ensure the effectiveness of measures against acts impairing competition that are manifested within the Common Market even where the perpetrator of these acts is established in a third country.

*Id.* at 8137. One of SGPM's experts acknowledges the substance of this holding, contending merely that the Court's decision was "untenable." Affidavit of Pierre B. Mayer, filed December 28, 1979, at ¶ 10.

The FTC cites impressive scholarly authority for the proposition that there are no generally applicable principles of international law prohibiting extra-territorial mail service. *See* Memorandum of the Federal Trade Commission on Remand, December 28, 1979, at 20. Although the SGPM experts contest this conclusion, the Second Affidavit of Pierre B. Mayer, filed January 18, 1980, appears to concede broad differences of opinion on the propriety of foreign mail service. Thus, at ¶ 6(i), Professor Mayer states:

It is undeniable that some States do not object to service by mail in their territory. The reason may be either that they do not deem the service of documents on persons residing in their territory to be a governmental function (Austria), or that service for them has the sole function of providing notice (Nordic countries). But other States do object; such is generally the case in civil law countries. Although Professor Mayer goes on to urge that the position of civil law countries, of which France is one, should be respected, his conclu-

the facts of this case do not support the proposition that the mailing of the Commission subpoena was an exercise of jurisdiction. The subpoena was not enforced nor was it enforceable by the agency. Both the subpoena and Judge Flannery's order to show cause sent by mail to SGPM in Paris were functionally notices. If enforcement of Judge Flannery's order had been necessary, or should become necessary, such enforcement could have been accomplished entirely in the United States, for example, by attachment of SGPM assets here. If it becomes necessary to enforce the subpoena, the Court has no intention of taking any action in France, or anywhere else outside the United States. Thus, no generally applicable principle of international law to which Congress could have been expected to defer bars mail service. Nor is there any practice of Congress to defer or even to acknowledge such a principle in other circumstances in which just such service was authorized.

### C.

The Court does not, by this conclusion, demean either the concerns of the French Government over the methods of service in its country, or the concerns of SGPM that compliance with the subpoena may expose it to criminal penalties in France. The Court has postponed the effective date of its order to give the U. S. Department of State a further opportunity to comment on the French note of January 10, 1980. SGPM has already had a full opportunity to form the October 2, 1978, enforcement order in a way that would minimize its burdensomeness. Nothing in the order being entered today forecloses SGPM from seeking further relief from specific burdens by application for a protective order before the FTC or in this Court. *See CAB v. Deutsche Lufthansa Aktiengesellschaft*, 591 F.2d at 952–53.

sion that there is a difference of opinion on the propriety of mail service would seem to resolve

the issue presented by the Court of Appeals mandate.