**FEDERAL TRADE COMMISSION,**
Appellee,

v.

**COMPAGNIE DE SAINT–GOBAIN–PONT–A–MOUSSON,**
Appellant.

No. 78–2160.

United States Court of Appeals, District of Columbia Circuit.

Argued 18 Oct. 1979.

Decided 17 Nov. 1980.

---

John T. Synnestvedt, John S. Child, Jr., Synnestvedt & Lechner, Philadelphia, Pa., for appellant.

Thomas A. Masterson, Philadelphia, Pa., a member of the bar of the Supreme Court of the United States, pro hac vice, by special leave of court, with whom Miles W. Kirkpatrick, Charles W. Smith and D. Edward Wilson, Jr., Washington, D. C., were on brief, for appellant.

David M. Fitzgerald, Atty., F. T. C., Washington, D. C., with whom Michael N. Sohn, General Counsel, Gerald P. Norton, Deputy Gen. Counsel and W. Dennis Cross, Asst. Gen. Counsel, F. T. C., Washington, D. C., were on brief, for appellee.

Before McGOWAN and WILKEY, Circuit Judges and GESELL *, United States District Judge for the District of Columbia.

Opinion for the Court filed by Circuit Judge WILKEY.

Opinion concurring filed by Circuit Judge McGOWAN.

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

WILKEY, Circuit Judge:

This case addresses a narrow issue of broad international consequence: did Congress expressly or impliedly authorize the Federal Trade Commission (FTC or Commission) to serve its investigatory subpoenas directly upon citizens of other countries by means of registered mail? Although on the surface this question appears to rest solely upon statutory interpretation, our answer to it is primarily guided by our recognition of established and fundamental principles of international law.

■ Federal courts have long acknowledged that the investigatory[1] and regulatory[2] reach of domestic agencies may, and often must, extend across national boundaries. This court has previously recognized that those agencies may under certain circumstances compel production of documents located abroad.[3] We cannot, however, simply assume from these precedents that Congress intended to authorize regulatory agencies in general—and the FTC in particular—to employ any and all *methods* to serve compulsory process when conducting their investigations. When an American regulatory agency directly serves its compulsory process upon a citizen of a foreign country, the *act of service itself* constitutes an exercise of American sovereign power within the area of the foreign country's territorial sovereignty. Though some techniques of service may prove less obnoxious than others to foreign sensibilities, our recognition of those sensibilities must affect our willingness to infer congressional authorization for a particular mode of service from an otherwise silent statute. In the face of the foreign country's direct protest to the mode of service employed here, and in the absence of clear congressional intent at the time this subpoena was served to authorize that manner of exercise of American sovereign power, we decline to infer the necessary statutory authority for the FTC's chosen mode of subpoena service.

## I. BACKGROUND

Since 1977 the FTC has been engaged in a nonpublic antitrust investigation of the U.S. fiberglass insulation industry to determine whether a number of fiberglass manufacturers and distributors have engaged in acts or practices in violation of section 5 of the FTC Act.[4] One of the principal targets of the FTC investigation has been Compagnie de Saint-Gobain-Pont-à-Mousson (SGPM), a French holding company headquartered in Paris, but with a general delegate based in New York City.[5] In September 1977 the Commission issued four identi-

1. *FMC v. DeSmedt*, 366 F.2d 464, 471 (2d Cir.), *cert. denied*, 385 U.S. 974, 87 S.Ct. 513, 17 L.Ed.2d 439 (1966); *SEC v. Minas de Artemisa*, 150 F.2d 215, 217 (9th Cir. 1945).

2. *American Banana Co. v. United Fruit Co.*, 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909); *United States v. Aluminum Co. of America*, 148 F.2d 416 (2d Cir. 1945); *United States v. Imperial Chem. Indus., Ltd.*, 105 F.Supp. 215 (S.D.N.Y.1952).

3. *CAB v. Deutsche Lufthansa Aktiengesellschaft*, 591 F.2d 951 (D.C.Cir.1979); *Montship Lines, Ltd. v. FMB*, 295 F.2d 147 (D.C.Cir. 1961).

4. 15 U.S.C. § 45 (1976).

5. In particular, the FTC has sought [t]o determine whether Owens-Corning Fiberglas Corporation, Certainteed Corporation [SGPM's American subsidiary], Johns-Manville Corporation, Compagnie de Saint-Gobain-Pont-a-Mousson, or others engaged directly or indirectly in the manufacture, distribution or sale of insulation are engaging or have engaged in acts or practices which may have restricted competition in the manufacture, distribution or sale of insulation ... including but not limited to acts or practices relating to licensing of patents applicable to the manufacture of insulation or textile fiberglass, the exchange of technology or know-how applicable to the manufacture of insulation and textile fiberglass, the availability of technology and know-how to potential entrants into the manufacture of insulation, the availability and price of raw materials used to manufacture insulation, the expansion and utilization of insulation manufacturing capacity, and the distribution, allocation and pricing of insulation products.

Resolution Directing Use of Compulsory Process in Nonpublic Investigation, *attached as* Exhibit 1, Petition for an Order Requiring Respondent to Produce Documentary Evidence in a Federal Trade Commission Investigation, *reprinted in* Joint Appendix (J.A.) at 36.

cal subpoenas *duces tecum* directing SGPM to produce specified classes of documents relevant to the investigation.[6] One copy of the subpoena was served by registered mailing to SGPM's corporate headquarters in Paris; the second was hand-delivered to the New York office of SGPM's general delegate in the United States; the third was delivered to the New York City residence of the daughter of SGPM's general delegate; and the fourth was served upon the Washington, D.C. attorney representing SGPM in a related proceeding.[7] When SGPM refused to comply with the subpoenas, the Commission petitioned the district court for an enforcement order pursuant to section 9 of the FTC Act.[8] In response to

the district court's order to show cause why the petition should not be granted,[9] SGPM asserted that it should be excused from compliance because none of the modes of subpoena service employed were authorized by the FTC Act.[10] Finding the subpoena relevant to the Commission's inquiry and the mode of service to be proper, the district court issued the requested order enforcing the subpoena on 29 September 1978.[11]

On appeal from the district court's denial of SGPM's motion to stay the enforcement order,[12] this court remanded the record to the district court.[13] Addressing only the issue whether the investigatory subpoena

---

**6.** The subpoenas were issued pursuant to an FTC resolution directing the Commission to use "all compulsory processes available to it" to carry out the investigation. *See* Resolution Directing Use of Compulsory Process in Nonpublic Investigation, *attached as* Exhibit 1, Petition for an Order Requiring Respondent to Produce Documentary Evidence in a Federal Trade Commission Investigation, *reprinted in* J.A. at 36. Each subpoena contained the following language:

> You are hereby *required* to appear before John R. Hoagland, an Attorney and Examiner of the Federal Trade Commission ... to testify in the Matter of Owens-Corning Fiberglas Corporation, et al.
>
> . . . . .
>
> And you are hereby *required* to bring with you and produce at said time and place the following books, papers, and documents....
> *Fail not at your peril.*

Exhibit 4, Petition for an Order Requiring Respondent to Produce Documentary Evidence in a Federal Trade Commission Investigation, *reprinted in* J.A. at 126 (emphasis added).

The letter which accompanied each subpoena further stated:

> You will take notice that the delivery of this subpoena to you by hand delivery is legal service *and subjects you to the penalty imposed by law for failure to appear.* For your information, duplicate subpoenas are being served upon you by other means and at other addresses.

Letter from Carol M. Thomas, Secretary, to Compagnie de Saint-Gobain-Pont-a-Mousson, 26 September 1977, *attached as* Exhibit A, Supplemental Memorandum of Appellant (emphasis added).

**7.** Petition for an Order Requiring Respondent to Produce Documentary Evidence in a Federal Trade Commission Investigation, *reprinted in* J.A. at 3.

**8.** Section 9 of the FTC Act, 15 U.S.C. § 49 (1976), empowers the Commission:

> to require by subpoena the attendance and testimony of witnesses and the production of all such documentary evidence relating to any matter under investigation....
>
> Such attendance of witnesses, and the production of such documentary evidence, may be required *from any place in the United States,* at any designated place of hearing. And in case of disobedience to a subpoena the Commission may invoke the aid of any court of the United States in requiring the attendance and testimony of witnesses and the production of documentary evidence.

(emphasis added).

**9.** *FTC v. Compagnie De Saint-Gobain-Pont-A-Mousson,* Misc. No. 78–0194, Order to Show Cause (D.D.C. 9 June 1978), *reprinted in* J.A. at 242.

**10.** At that time, however, SGPM did not contest the *district court's* jurisdiction, for the district court's order to show cause was served on SGPM's agent in New York pursuant to Fed.R. Civ.P. 4(i). *FTC v. Compagnie De Saint-Gobain-Pont-A-Mousson,* Misc. No. 78–0194, Order Enforcing Subpoena as modified (D.D.C. 29 Sept. 1978), *reprinted in* J.A. at 421–22.

**11.** *Id.*

**12.** *FTC v. Compagnie De Saint-Gobain-Pont-A-Mousson,* Misc. No. 78–0194, Order Denying Respondent's Motion for Stay Pending Appeal (D.D.C. 30 Oct. 1978), *reprinted in* J.A. at 450.

**13.** *FTC v. Compagnie De Saint-Gobain-Pont-A-Mousson,* No. 78–2160 (D.C.Cir. 26 Nov. 1979) (per curiam).

had been served upon SGPM in a lawful manner, we concluded that the latter three methods of subpoena service employed by the Commission were improper.[14] We directed the district court on remand to "examine carefully the validity *vel non* of [the first method of] service by the registered mailing to [SGPM's] corporate headquarters in Paris,"[15] and in particular, to construe the relevant authorizing statutes to determine the underlying congressional intent.[16] At the time we cautioned the district court to pay special attention to whether its construction of the relevant statutes conformed to accepted principles of international law, "since Congress is customarily presumed, unless a plain intention appears to the contrary, to avoid conflict with such principles as well as with the Constitution."[17]

Following argument on remand, the French Embassy sent a note to the State Department, protesting that the FTC's direct transmittal of its subpoena to SGPM's Parisian headquarters via registered mail constituted an infringement of French national sovereignty.[18] The French government's protests notwithstanding, the district court concluded that neither the Constitution nor statute "intended to deny the FTC the right to send a subpoena by mail to a foreign corporation suspected . . . of unfair trade practices in violation of the Federal Trade Commission Act."[19] Consequently, on 14 February 1980, the district court issued a second order reiterating its original enforcement of the FTC subpoena.[20] For reasons articulated below, we vacate both the enforcement order dated 29 September 1978 and the order dated 14 February 1980.

## II. ANALYSIS

■ The sole issue to be resolved on this appeal is the propriety of the *technique* employed by the FTC to serve its subpoena abroad—namely, registered mailing to a foreign citizen on foreign soil. We will begin by examining whether, at the time service was attempted, the language of the FTC Act expressly authorized service by registered mail of FTC subpoenas abroad and whether the legislative history of the FTC Act and similarly worded statutes revealed any congressional intent to authorize such a mode of service. Next, after clarification of two distinctions blurred by the opinion below, we reject the district court's conclusions that accepted principles of international law condone the mode of subpoena service employed here. We then suggest that basic canons of statutory construction do not permit authority for such a

14. *Id.,* mem. op. at 2 n.2.

15. *Id.* at 2.

16. *Id.*

17. *Id.*

18. The relevant text of the French note read as follows:

The Embassy of France informs the Department of State that the transmittal by the FTC of a subpoena directly by mail to a French company (in this case Saint-Gobain Pont-à-Mousson) is inconsistent with the general principles of international law and constitutes a failure to recognize French sovereignty [sic]. Moreover, the French Government has expressed formal reservations regarding the application in France of the principle of pre-trial discovery of documents characteristic of common law countries.

Furthermore, the response to certain of the requests from the FTC could subject the directors of Saint-Gobain Pont-à-Mousson to civil and criminal liability and therefore expose them to judicial proceedings in France.

Consequently, the Embassy of France would be grateful if the Department of State would make this position known to the various American authorities concerned by informing them that the French Government wishes such steps both in this matter and in any others which may subsequently arise, to be taken solely through diplomatic channels. Note to the U.S. State Department from the French Embassy Regarding the FTC Investigation of SGPM, 10 January 1980, (translated by Department of State Division of Language Services) *attached as* Exhibit B, Supplemental Memorandum of Appellant.

As of this writing, the State Department has offered no response to the French government note. *See* note 139 *infra.*

19. *FTC v. Compagnie De Saint-Gobain-Pont-A-Mousson,* 493 F.Supp. 286, 290 (D.D.C.1980).

20. Id. [slip opinion] at 14 [unpublished order].

mode of subpoena service to be inferred from the FTC's general jurisdictional mandates to investigate and regulate foreign and interstate commerce.

We conclude that, at the time the subpoena was served, Congress intended to authorize the FTC to employ only those customary and legitimate methods of service of compulsory process commonly employed by American courts and administrative agencies when serving its subpoenas abroad. Because service of compulsory process by registered mail had not customarily proved a legitimate means of summoning a third-party witness to appear, with or without documents, in an agency investigation, we find that the method of service employed by the FTC in this case was unauthorized and hence invalid.

### A. *Statutory Language and Legislative History*

Traditional techniques of statutory construction avail us little in uncovering Congress' intent regarding proper methods of subpoena service abroad. Opposing counsel acknowledge that, as of the date of the service challenged here, the language of the

FTC Act nowhere expressly authorized, nor expressly prohibited, direct service of FTC subpoenas abroad by means of registered mail.[21] We shall briefly canvass those statutory provisions potentially applicable at the date of service.

Section 5(f)(c) of the FTC Act, set out in the margin provided that "[c]omplaints, orders, and other processes of the Commission under this section may be served" by registered or certified mail.[22] In ruling on SGPM's motion to quash, however, the Commission correctly read the plain language of section 5(f)(c) *not* to apply to the service of the investigatory subpoenas challenged here, because such subpoenas, issued under section 6, 9, and 10 of the Act[23] simply did not constitute "processes of the Commission under *this* section [section 5]."[24] Nor did section 6(g) of the Act, granting the Commission broad rulemaking authority to shape its investigatory procedures,[25] authorize or prohibit the manner of service employed here. It is true that this provision had previously been construed to afford the FTC broad discretion in determining which modes of service of process were appropriate.[26] In fact, under this statutory section, the FTC promulgated its

---

**21.** *See* SGPM Brief on Remand at 3–6; SGPM Reply Brief on Remand at 3–4; FTC Memorandum on Remand at 12 n.7. *See also FTC v. Compagnie De Saint-Gobain-Pont-A-Mousson*, 493 F.Supp. 286, 290–291, 293, 294 (D.D.C. 1980). *But see* note 140 and accompanying text *infra*.

**22.** Complaints, orders, and other processes of the Commission *under this section* may be served ... either (a) by delivering a copy thereof to the person to be served, or to a member of the partnership to be served, or the president, secretary, or other executive officer or a director of the corporation to be served; or ... (c) by mailing a copy thereof by registered mail or by certified mail addressed to such person, partnership, or corporation at his or its residence or principal office or place of business. The verified return by the person so serving said complaint, order, or other process setting forth the manner of said service shall be proof of the same, and the return post office receipt for said complaint, order, or other process mailed by registered mail or by certified mail as aforesaid shall be proof of the service of the same.
15 U.S.C. § 45(f) (1976) (emphasis added).

**23.** *See* Resolution Directing Use of Compulsory Process in Nonpublic Investigation, *reprinted in* J.A. at 36 (citing FTC's statutory authority to issue investigatory subpoenas).

**24.** *See* Brief for Appellee at 17; Supplemental Brief of Appellee at 6. *See also FTC v. Rubin*, 145 F.Supp. 171, 175–76 (S.D.N.Y.1956), *rev'd on other grounds*, 245 F.2d 60 (2d Cir. 1957) (section 5(f) does not apply to subpoenas).

**25.** 15 U.S.C. § 46(g) 1976) provides:
The Commission shall also have power—

$\cdot$ $\cdot$ $\cdot$ $\cdot$ $\cdot$

(g) From time to time to ... make rules and regulations for the purpose of carrying out the provisions of sections 41 to 46 and 47 to 48 of this title.

**26.** In *Hunt Foods & Indus., Inc. v. FTC*, 286 F.2d 803 (9th Cir. 1960), *cert. denied*, 365 U.S. 877, 81 S.Ct. 1027, 6 L.Ed.2d 190 (1961), the Ninth Circuit noted:
In our opinion [section 6(g)] is broad enough to authorize the [Federal Trade] Commission to provide by rule for the manner of service of process with respect to those activities and duties concerning which there is no statute expressly applicable.

Rule of Practice 4.4(a), which specifically authorized service of subpoenas by registered or certified mail.[27] Yet rule 4.4(a), as it existed at the time of service, suggested no limits as to *where,* or upon *whom,* subpoenas might properly be served.

When the challenged subpoena was served, the only statutory source of instruction as to the permitted *geographic* range of subpoena service was FTC Act section 9, which empowered the Commission to require by subpoena the attendance of witnesses and the production of documentary evidence relating to a matter under investigation "from *any place in the United States,* at any designated place of hearing." [28] This seemingly unambiguous language of section 9 (and of statutes incorporating identical locutions) [29] had engendered surprising controversy. In *FMC v. De-Smedt,*[30] Judge Friendly reviewed the legislative history of the "from any place in the United States" language of a provision nearly identical to that found in the FTC Act.[31] He found that the phrase had first been added to the original ICC Act [32] in order to clarify the agency's power to compel a witness' appearance by subpoena inside the United States, but outside the boundaries of the judicial district in which the witness resided.[33] Despite the note of caution injected by the dissent to *DeSmedt,*[34] this Circuit chose to adopt Judge Friendly's rationale virtually without

---

*Id.* at 810.

27. At the time the challenged subpoena was served, section 4.4(a)(1) of the FTC's Rules of Practice and Procedure provided:

Service of subpoenas . . . may be effected as follows:

(1) By registered or certified mail—A copy of the document shall be addressed to the person, partnership, corporation or unincorporated association to be served at his, her or its residence or principal office or place of business, registered or certified, and mailed. . .

16 C.F.R. § 4.4(a) (1978)

Subsequent to the service of the instant subpoena and the district court's decision, the Commission amended rule 4.4 to provide:

§ 4.4 Service

(a) By the Commission. (1) Service of complaints, initial decisions, final orders, and other processes of the Commission under 15 U.S.C. 45 may be effected as follows:

(i) *By registered or certified mail.*—A copy of the document shall be addressed to the person, partnership, corporation or unincorporated association to be served at his, her or its residence or principal office or place of business, registered or certified, and mailed; or

(ii) *By delivery to an individual.*—A copy thereof may be delivered to the person to be served, or to a member of the partnership to be served, or to the president, secretary, or other executive officer or a director of the corporation or unincorporated association to be served; or

(iii) *By delivery to an address.*—A copy thereof may be left at the principal office or place of business of the person, partnership, corporation or unincorporated association, or it may be left at the residence of tne person or of a member of the partnership or of an executive officer or director of the corpora-

tion, or incorporated [sic] association to be served.

(2) All other orders and notices, *including subpoenas,* orders requiring access, orders to file annual and special reports, and notices of default, may be served by *any method reasonably certain to inform the affected person, partnership, corporation, or unincorporated association including any method specified in paragraph (a)(1) of this section.*

43 Fed.Reg. 56,903 (1978) (codified at 16 C.F.R. § 4.4(a)). (emphasis added).

28. 15 U.S.C. § 49 (1976) (emphasis added). For full text, see note 8 *supra.*

29. Section 9 of the FTC Act derives its language from Interstate Commerce Act § 12, 49 U.S.C. § 12(2) (1976), and incorporates phrases identical to provisions conferring subpoena authority on other agencies, including the CAB, 49 U.S.C. § 1484(c) (1976), the FMC, 46 U.S.C. § 826(a) (1976), and the SEC, 15 U.S.C. § 77s(b) (1976).

30. 366 F.2d 464 (2d Cir.), *cert. denied,* 385 U.S. 974, 87 S.Ct. 513, 17 L.Ed.2d 439 (1966).

31. Section 27, Shipping Act of 1916, 46 U.S.C. § 826 (1976).

32. 49 U.S.C. § 12 (1976). As originally enacted, 24 Stat. 383 (1887), and as first amended, 25 Stat. 859 (1889), the ICC Act did not contain the phrase "from any place in the United States." *See* 366 F.2d at 470–71.

33. *Id.*

34. Circuit Judge Moore, dissenting in *DeSmedt,* observed:

When Congress authorized the production of evidence "from any place in the United

analysis in *CAB v. Deutsche Lufthansa Aktiengesellschaft*,[35] finding that the language in question "was not intended as a limitation on agency subpoena authority, but rather ... to free the agency of the geographic limitations imposed on subpoenas issued by the district courts." [36]

■ While these cases clearly suggested that documents might be subpoenaed by regulatory agencies from anywhere inside the United States—and, in some cases, might be obtainable even when located outside the territorial jurisdiction of the United States [37]—they by no means suggested that Congress intended the FTC subpoena power to have no place or manner limits whatever. Neither opinion cast light on the *modes* of subpoena service expressly endorsed by the legislative branch—in neither *DeSmedt* nor *Lufthansa* was the propriety of the *technique* of subpoena service at issue. Furthermore, neither case expressly considered the particular situation before us—subpoena service upon a foreign citizen residing on foreign soil.[38] Thus, neither the terms of the relevant statute, nor the cases interpreting those terms, conclusively settle the novel issue before us.

Nor does the legislative history of the FTC Act or similar statutes afford us any guidance. Both parties agreed,[39] and the court below acknowledged,[40] that at the time of service the history of the Act was "wholly silent" regarding which modes of foreign service of investigatory subpoenas were or were not proper.

States," it is to be presumed that it was aware of the territory embraced within the United States. If Congress had intended to enact legislation authorizing such production "from any place in the world," it is again to be presumed that it had available sufficiently skilled draftsmen who could have used "world" instead of "United States"—a not altogether too difficult bit of draftsmanship. The real difficulty which seems to have faced the majority ... is to demonstrate that the "plain" meaning of "United States" is "world." Even in this day, when these terms appear to be becoming congruous, I find the supposition that Congress could not understand the difference, and hence requires judicial legislation to express its real intent, quite incongruous.

*Id.* at 474.

In the same dissent Judge Moore commented that the Senate had "recognized that the expansion of the FMC's subpoena power under Section 27 in the face of the strongest possible objection from the State Department and explicit directives not to produce documents from numerous friendly maritime nations (including the United Kingdom, Italy and Japan) 'would only muddy the waters and do violence to our foreign policy ...'" *Id.* (citations omitted).

**35.** 591 F.2d 951 (D.C.Cir.1979) (per curiam) (discussing the CAB's subpoena authority, conferred by 49 U.S.C. § 1484(c) 1976)).

**36.** *Id.* at 953.

**37.** An American court has the power to compel a person *over whom it has personal jurisdiction* to appear, *see, e. g., Blackmer v. United States*, 284 U.S. 421, 52 S.Ct. 252, 76 L.Ed. 375 (1932), *discussed at* notes 110–19 *infra* and accompanying text, or to produce documents outside the court's jurisdiction, *see SEC v. Minas de Artemisa*, 150 F.2d 215, 217 (9th Cir. 1945). *See also* 5A Moore's Federal Practice ¶¶ 45.01, 45.07 (2d ed. 1976); Smit, *International Aspects of Federal Civil Procedure*, 61 Colum.L. Rev. 1031, 1052 (1961); W. Fugate, Foreign Commerce and the Antitrust Laws §§ 3.10–.13 (1958); Gill, *Problems of Foreign Discovery*, in K. Brewster, Antitrust and American Business Abroad 474–88 (1958); Note, *Subpoena of Documents Located in Foreign Jurisdiction where Law of Situs Prohibits Removal*, 37 N.Y.U.L. Rev. 295 (1962).

**38.** In *DeSmedt*, Judge Friendly relied upon an early case holding that section 19b of the Securities Act of 1933, 15 U.S.C. § 77s(b) (1976), was intended broadly to empower the SEC to require attendance of witnesses or production of documents. 366 F.2d at 469. In that case, however, the Ninth Circuit accompanied its finding with the proviso "only that service of the subpoena is made *within the territorial limits of the United States.*" *SEC v. Minas de Artemisa*, 150 F.2d 215, 218 (9th Cir. 1945) (emphasis added). *See also Ludlow Corp. v. DeSmedt*, 249 F.Supp. 496, 501 (S.D.N.Y.), *aff'd sub nom. FMC v. DeSmedt*, 366 F.2d 464 (2d Cir.), *cert. denied*, 385 U.S. 974, 87 S.Ct. 513, 17 L.Ed.2d 439 (1966) (the sole territorial limitation on the subpoena is that "it be served within the United States").

**39.** *See* FTC Memorandum on Remand at 12 & n.7; Supplemental Memorandum of Appellant at 4. *But see* text accompanying note 140 *infra.*

**40.** *FTC v. Compagnie De Saint-Gobain-Pont-A-Mousson*, 493 F.Supp. 286, 290–291 (D.D.C. 1980).

Confronted with both a silent statute and an uninstructive legislative history, the district court sought guidance in the breadth of authority granted by the Constitution to Congress to regulate commerce with foreign nations—a power "as great if not greater, than its power to regulate interstate commerce."[41] When Congress created the FTC as the agency charged with investigation and regulation of unfair trade practices, the district court concluded, it must have intended that agency to wield the "broadest power to make commerce, foreign and domestic, fair."[42] From the FTC's discretionary authority to investigate and regulate foreign commerce, the district court thus inferred the Commission's *power* to serve its process abroad:

> It seems beyond reasonable dispute that the FTC could not faithfully execute its congressional mandate to investigate and enforce laws regulating foreign and domestic commerce if its process could not reach companies incorporated and headquartered abroad which nevertheless have substantial and continuing impacts on the foreign and domestic commerce of the United States.[43]

Since past judicial interpretations of statutory language identical to that in FTC Act section 9 had studiously avoided "reading into the statute artificial limits on the investigatory power of the agencies,"[44] the district court chose to read that section as presumptively authorizing the FTC to deliver its subpoenas over a *limitless geographic area.*[45]

By implication, the district court also created a presumption in favor of *any means*

of subpoena service which the FTC might decide to employ.[46] In creating this presumption, the court explicitly rejected the notion that any "clear statement" of congressional intent was required to authorize any *particular* method of foreign service. Not only had Congress previously authorized direct service of *process* abroad without such a "clear statement,"[47] the court suggested, but there are no "generally applicable principles of international law regarding [permissible or impermissible] methods of service to which Congress might be expected to defer."[48]

We find the district court's opinion unconvincing because of its failure to draw two distinctions of critical importance in international law: the first, based on the type of *document* being served; the second, based on the type of *jurisdiction* being invoked. By failing to draw these crucial distinctions, the district court failed to give adequate weight to fundamental principles of international law which disfavor methods of extraterritorial subpoena service circumventing official channels of judicial assistance,[49] oppose judicial enforcement of investigatory subpoenas abroad,[50] and prohibit the particular manner of subpoena service employed here.[51]

**B.** *The Legitimacy of the FTC's Method of Service Under International Law*

**1.** *The Nature of the Document Served*

■ As one of several targets of an FTC investigation which remains in a preliminary phase, SGPM has neither the status of an accused in a criminal action nor the status of a defendant in a civil action. Al-

**41.** *Id.* at 291.

**42.** *Id.* at 292.

**43.** *Id.*

**44.** *Id.* at 292–293, *citing CAB v. Deutsche Lufthansa Aktiengesellschaft, see* notes 35–36 *supra* and accompanying text; *FMC v. DeSmedt, see* notes 30–34 *supra* and accompanying text; and *SEC v. Minas de Artemisa,* see note 38 *supra.*

**45.** *FTC v. Compagnie De Saint-Gobain-Pont-A-Mousson,* 493 F.Supp. 286, 293 (D.D.C.1980).

**46.** *Id.*

**47.** *Id.* at 294.

**48.** *Id.* at 294–295.

**49.** *See* Part B.1 *infra.*

**50.** *See* Part B.2.a *infra.*

**51.** *See* Part B.1 *infra.*

though as a result of the agency investigation, SGPM may eventually be named a defendant in a civil action, presently it is merely a third-party witness on notice of its potential status as a party defendant. The FTC's subpoena *duces tecum* and accompanying letter ought not, therefore, be viewed merely as a summons giving *notice* of a complaint initiating a lawsuit against SGPM. Rather, the FTC's issuance of a subpoena and the district court's enforcement thereof, represent a classic exercise of *compulsory process*, intended to secure the personal appearance of and production of documents by an otherwise unwilling witness through threat of judicial sanctions for noncompliance.[52]

The distinction between service of notice and service of compulsory process is a crucial one under principles of both domestic and international law. When an agency serves a party with notice of the pendency of an action, it thereby supplies the recipient with information upon which he may base a decision to act or not. When an agency serves *compulsory* process upon a third-party witness, regardless of the technique of service employed, it effectively *compels* that witness to do something and threatens him with sanctions should he choose not to comply. Thus, when the FTC issues and serves a formal complaint upon a respondent, charging him in an adjudicative proceeding with violation of one or more of the statutes it administers, the purpose of service is primarily *notice*, rather than *compulsion*.[53] Once the respondent is served with a copy of the complaint and the proposed order, he then has the options of meeting with the Commission's counsel to negotiate a consent order or of proceeding to litigation, the result of which may always be appealed before any cease-and-desist order may issue. Not until the cease-and-desist order becomes final, through affirmance by a court of appeals or the Supreme Court (if taken to that Court by *certiorari*), will the coercive power of the courts be directly brought to bear upon the respondent.[54]

When a witness is served with compulsory process in the form of an investigatory subpoena, however, the consequences of noncompliance are strikingly different.[55] Should the witness fail to produce material responsive to the subpoena, the full enforcement power of the federal courts may immediately be brought to bear upon him. Disobedience is itself both a statutory crime and an occasion for imposition of a money penalty.[56] The Commission may seek a judicial order directing compliance or a finding that the respondent is in contempt of court.[57] Summary proceedings may be be-

---

52. We might therefore view the respondent's position here as analogous to that of an American company about to become the target of an investigation by the Antitrust Division of the Department of Justice. The Antitrust Division could subpoena officers and agents of the corporation to appear before a grand jury with documents, and the resulting grand jury inquiry could then produce either an indictment of the American company or a civil action against it under the pertinent antitrust laws. In either event, however, at the subpoena stage, the American company and its agents would be mere third-party witnesses apprised of their status as targets of an investigation. The subpoena directed to them would give them notice of that fact and compel their appearance, but neither the company nor its agents would have assumed the status of parties until a civil or criminal complaint had been filed in the proper court.

53. Formal FTC adjudicative proceedings are governed by Part 3 of the FTC Rules of Practice, 16 C.F.R. §§ 3.2 *et seq.* (1978).

54. *See* 15 U.S.C. § 21 (1976) (enforcement provisions).

55. Unlike "litigative" subpoenas issued in adjudicative agency proceedings, *see* 16 C.F.R. § 3.34 (1978), investigatory subpoenas are issued under Part 2 of the FTC Rules of Practice, *id.* at §§ 2.1 *et seq.*, governing *non*adjudicative procedures.

56. The Federal Trade Commission Act authorizes a fine of $1000 to $5000 or a year's imprisonment or both, upon conviction by a court of competent jurisdiction, for any person who refuses to attend or produce documentary evidence "in obedience to the subpoena or lawful requirement of the Commission." 15 U.S.C. § 50 (1976).

57. The Procedures and Rules of Practice for the Federal Trade Commission, as amended to 1

gun under Fed.R.Civ.P. 81(a)(3),[58] with a finding of contempt the ultimate penalty.[59] In the event of continued noncompliance, a district court could presumably enforce its order by seizing the noncomplying respondent's assets wherever they might be found and lawfully attached,[60] by holding the officers and agents of the corporation in contempt, or by otherwise exercising its discretion to punish a potential witness' recalcitrance. Unlike service of a summons and complaint upon a named defendant, delivery of the FTC's investigatory subpoena upon a witness carries with it the full array of American judicial power.

█ The distinction between notice and compulsory process, and the implications of that distinction for permissible *modes* of service, is well illustrated in the context of civil litigation. Federal Rule of Civil Procedure 4, which governs service of process, is primarily concerned with effectuating notice.[61] To that end, the rule provides for a wide range of alternative methods of service, including registered mail, each designed to ensure the receipt of actual notice of the pendency of the action by the defendant.[62] By contrast, Federal Rule 45(c), governing subpoena service, does not permit any form of mail service, nor does it

---

February 1980, provide the following range of penalties for noncompliance with compulsory processes:

### § 2.13 Noncompliance with compulsory processes

(a) In cases of failure to comply with Commission compulsory processes, appropriate action may be initiated by the Commission or the Attorney General, including actions for enforcement, forfeiture, or penalties or criminal actions.

(b) The General Counsel, pursuant to delegation of authority by the Commission, without power of redelegation, is authorized.

(1) To institute, on behalf of the Commission, an enforcement proceeding in connection with the failure or refusal of a person, partnership, or corporation to comply with, or to obey, a subpoena, if the return date or any extension thereof has passed;

(2) To institute enforcement proceedings on behalf of the Commission and to request on behalf of the Commission the institution of civil actions, as appropriate, in conjunction with the Commission's quarterly financial reporting program, if the return date or any extension thereof has passed;

(3) To approve and have prepared and issued, in the name of the Commission when deemed appropriate by the General Counsel, a notice of default in connection with the failure of a person, partnership, or corporation to timely file a report pursuant to section 6(b) of the Federal Trade Commission Act [section 46(b) of this title], if the return date or any extension thereof has passed;

(4) To institute, on behalf of the Commission, an enforcement proceeding and to request, on behalf of the Commission, the institution, when deemed appropriate by the General Counsel, of a civil action in connection with the failure of a person, partnership, or corporation to timely file a report pursuant to an order under section 6(b) of the Federal Trade Commission Act [section 46(b) of this title], if the return date or any extension thereof has passed; and

(5) To seek civil contempt in cases where a court order enforcing compulsory process has been violated.
16 C.F.R. § 2.13 (1980).

58. Fed.R.Civ.P. 81(a)(3) states, in part:
These rules apply to proceedings to compel the giving of testimony 'or production of documents in accordance with a subpoena issued by an office or agency of the United States under any statute of the United States except, as otherwise provided by statute or by rules of the district court or by order of the court in the proceedings.

59. Fed.R.Civ.P. 45(f).

60. *See FTC v. Compagnie De Saint-Gobain-Pont-A-Mousson*, 493 F.Supp. 286, 295–296 (D.D.C.1980).

61. The general attitude of the federal courts is that the provisions of Rule 4 should be liberally construed in the interest of doing substantial justice and that the propriety of service in each case should turn on its own facts within the limits of the flexibility provided by the rule itself. This is consistent with the modern conception of service of process as *primarily a notice-giving device.*
4 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 1083, at 332–33 (1969 & Supp.1977) (emphasis added). *See also id.* § 1063, at 204:
The primary function of Rule 4 is to provide the mechanisms for bringing *notice of the commencement of an action* to defendant's attention and to provide a ritual that marks the court's assertion of jurisdiction over the lawsuit.
(emphasis added).

62. *See* Fed.R.Civ.P. 4(d) (giving seven options); 4(e) (giving two options); 4(i) (giving five options).

allow service of the subpoena merely by delivery to a witness' dwellingplace.[63] Thus, under the Federal Rules, compulsory process may be served upon an unwilling witness only in person. Even within the United States, and even upon a United States citizen, service by registered U.S. mail is never a valid means of delivering compulsory process, although it may be a valid means of serving a summons and a complaint.[64]

█ When the individual being served is not an American on U.S. soil but a foreign subject on foreign soil, the distinction between the service of notice and the service of compulsory process takes on added significance. When process in the form of summons and complaint is served overseas, the informational nature of that process renders the act of service relatively benign.[65] When compulsory process is served, however, the act of service *itself* constitutes an exercise of one nation's sovereignty within the territory of another sovereign.[66] Such an exercise constitutes a violation of international law.[67] Given its informational nature, service of process from the United States into a foreign country by registered mail may thus be viewed as the least intrusive means of service—*i. e.*, the device which minimizes the imposition upon the local authorities caused by official U.S. government action within the boundaries of the local state.[68] Given the compulsory nature of a subpoena, however, subpoena service by direct mail upon a foreign citizen on foreign soil, without warning to the officials of the local state and without initial request for or prior resort to established channels of international judicial assistance,[69] is perhaps maximally intrusive.[70]

---

**63.** *Compare* Fed.R.Civ.P. 45(c) *with* Fed.R. Civ.P. 4(d)(1).

**64.** *See, e. g., Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950) (due process permits service of process by mail so long as such service provides "notice reasonably calculated . . . to apprise interested parties of the pendency of the action").

**65.** *See* note 61 *supra.*

**66.** Thus, Professor Miller notes that the Swiss, for example, carefully distinguish between "legal documents issued in connection with the proceedings before a foreign tribunal that are of an *informational nature*, such as papers notifying the recipient of a tax deficiency or of probate matters, [which] may be served privately in Switzerland without the assistance or intervention of the federal or cantonal authorities" and documents relating to any phase of civil litigation that attempt to *command* the addressee to appear or perform an act, which may *not* be served privately. *See* Miller, *International Cooperation in Litigation Between the United States and Switzerland: Unilateral Procedural Accommodation in a Test Tube*, 49 Minn.L.Rev. 1069, 1075 (1965) (emphasis added) [hereinafter Miller].

**67.** "[T]he first, and foremost restriction imposed by international law upon a State is that—failing the existence of a permissive rule to the contrary—it may not exercise its powers in any form in the territory of another State." Case of The S.S. "Lotus," [1927] P.C.I.J., Ser. A., No.10 at 18, 2 M. Hudson, World Court Reports 20, 35 (1935) [hereinafter *The S.S. Lo-*

*tus*]. *See also* 1 L. Oppenheim, International Law § 144b (8th ed. Lauterpacht 1955) ("States must not perform acts of sovereignty within the territory of other States").

**68.** *See, e. g.*, Smit, *International Aspects of Federal Civil Procedure*, 61 Colum.L.Rev. 1031, 1042 n.58 (1961): "since service [of process] by mail requires activity only on the part of a *foreign country's postal authorities, it is one of* the forms of service least likely to be prohibited." *See also* 4 C. Wright & A. Miller, note 61 *supra*, § 1134, at 564 (1969 & Supp.1977): "[S]ervice by mail may be less objectionable than some other method of service to the authorities in a foreign country that frowns upon the performance of 'sovereign' or 'judicial' acts within its borders on behalf of foreign litigation."

**69.** We should note here that direct service of American subpoenas abroad does not *always* violate international law. A nation may give general consent to service of compulsory process upon its nationals by another nation's government agencies by signing an international convention. *See, e. g.*, Multilateral Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters, *done* 15 November 1965, [1969] 20 U.S.T. 361, T.I.A.S. No. 6638, 658 U.N.T.S. [hereinafter Hague Convention]. The Hague Convention specifically recognizes, however, a signatory's right to refuse to honor any particular foreign request for service of judicial documents "if it deems that compliance would infringe its sovereignty or security." *Id.* at art. XIII. *See also* note 136 *infra.*

Not only does it represent a deliberate by-passing of the official authorities of the local state,[71] it allows the full range of judicial sanctions for noncompliance with an agency subpoena to be triggered merely by a foreign citizen's unwillingness to comply with directives contained in an ordinary registered letter.

■ The district court failed to recognize either of these consequences in enforcing the Commission's subpoena. The district court's opinion cited a number of state and federal statutes governing judicial service of *process* abroad to justify the assertion that no clear congressional authorization is necessary before an agency may employ a particular form of *subpoena* service abroad.[72] Although it is true that Federal Rule of Civil Procedure 4(i)(1)(D) specifically permits service of process abroad "by any form of mail, requiring a signed receipt," [73] that subprovision, when read together with the other four modes of foreign service of process provided in rule 4(i), underlines rather than obviates the need for judicial sensitivity to foreign territorial sovereignty when scrutinizing particular methods of overseas service.[74] Furthermore, the refer-

Alternatively, a nation may consent to a particular request for service, and specify an appropriate procedural mechanism whereby the serving nation's compulsory process may be served on its own citizens, thus minimizing the infringement upon its own sovereignty caused by the service itself. One example of specific consent occurred in November 1961, when the Swiss Embassy delivered an aide-memoire to the Department of State protesting the service by mail of judicial documents on Swiss residents by a U.S. government agency. Observing that "the service of judicial documents on persons residing in Switzerland is, under Swiss law, a governmental function to be exercised exclusively by the appropriate Swiss authorities," and that "service of such documents by mail constitutes an infringement of Switzerland's sovereign powers, which is incompatible with international law," the aide-memoire requested that "documents destined for Switzerland should be transmitted by the U.S. Embassy in Berne to the Federal Division of Police." The Department of State officially apologized to the Swiss Embassy for its inadvertent violation of applicable Swiss law and directed the responsible American agency to "avoid any future transmittals of such documents in a manner inconsistent with Swiss law." Dept. of State, MS file 711.331/11–1661, 28 Nov. 1961, *reprinted in Contemporary Practice of the United States Relating to International Law*, 56 Am.J. Int'l L. 793, 794 (1962).

**70.** *See, e. g.,* Professor Wigmore's discussion of "Compelling an unwilling witness residing abroad":

> For states *without the United States* . . . apart from letters rogatory, what method can be used for compelling the testimony of an unwilling witness there residing?
>
> . . . . .
>
> [T]he forum court in the United States can *notify* the witness, requesting him to appear before the United States consul for deposing, and upon his failure there to appear or to answer can punish him for contempt (by fine

or forfeiture), *provided the witness is a citizen of the United States and otherwise is subject to a testimonial duty in the forum court*; for his civic duty may extend to conduct abroad as well as at home.

> But . . . the forum court *cannot* issue a subpoena to a witness *commanding* him to appear before the consul, for this would be an attempted exercise of state power within the territory of the foreign state—an intrusion impossible in legal theory and in international understanding.

J. Wigmore, Evidence § 2195c, at 101 (McNaughton rev. ed. 1961) (emphasis added).

**71.** It is precisely to avoid such bypassing by foreign governments that the Swiss authorities, for example, insist on examining the contents of all judicial documents sent into their country.

> The need to examine the contents of foreign documents is . . . defended as an integral element of Swiss sovereignty and essential to the national policies of neutrality and protection of commercial and industrial secrets. The theory appears to be that if requests for service were not channeled through and scrutinized by appropriate Swiss officials, there would be no effective way to insure the service of the foreign documents was not contrary to Swiss public policy.

Miller, note 66 *supra,* at 1076–77.

**72.** *FTC v. Campagnie De Saint-Gobain-Pont-A-Mousson,* 493 F.Supp. 286, 294–295 (D.D.C. 1980).

**73.** Fed.R.Civ.P. 4(i)(1)(D).

**74.** Federal Rule 4(i) provides for five alternative methods by which a party may serve process abroad: in the manner prescribed by the foreign country for service there in a domestic action; as directed by the foreign authority responding to a letter rogatory from the federal court; by personal service; by mail; and as directed by order of the federal court. Rule 4(i)

ences made in rule 4(i) to alternative *official* channels for foreign service [75] indicate that the district court erred in construing congressional silence as authorizing regular and unrestrained circumvention of a foreign nation's judicial authorities.[76] In view of the significant sanctions conditionally imposed by the agency's subpoena and the foreign sensibilities aroused by the mode of delivery used here,[77] the district court's finding that Congress "intended" the FTC to deliver its compulsory processes solely with the aid of foreign postal authorities seems mistaken.

### 2. The Nature of the Jurisdiction Invoked by the FTC's Service

The exercise of jurisdiction by any governmental body in the United States is subject to limitations reflecting principles of international and constitutional law, as well as the strictures of the particular statute governing that body's conduct. When more than one nation is involved, jurisdictional issues are often elusive. Some jurisdiction which American governmental bodies might exercise consistently with the U.S. Constitution and laws could violate international law, while some exercises of jurisdiction to which international law does not object may violate the Constitution or laws of the United States. The jurisdictional questions posed by this case are peculiarly complex because the jurisdiction of three institutions is at issue: the jurisdiction of the *nations* involved, under international law, to require production of documents by a French citizen on French soil; the jurisdiction of the *federal courts* to enforce the agency's subpoena; and the jurisdiction of the *agency* to effect service of its subpoena by registered mail.

### a. The International Jurisdiction of States

■ The Restatement (Second) of the Foreign Relations Law of the United States distinguishes two types of jurisdiction of a state: jurisdiction to prescribe and jurisdiction to enforce.[78] Jurisdiction to prescribe signifies a state's authority to enact laws governing the conduct, relations, status or interests of persons or things, whether by legislation, executive act or order, or administrative rule or regulation.[79] Jurisdiction to enforce, by contrast, describes a state's authority to compel compliance or impose sanctions for noncompliance with its administrative or judicial orders.[80] International

was originally proposed by the Commission and Advisory Committee on International Rules of Judicial Procedure, an official organization having State Department representation, and the text adopted grew out of the cooperation between that agency and the Columbia Project on International Procedure.

> The intention of these provisions [was] to provide American attorneys with an extremely flexible framework to permit accommodation to the widely divergent procedures for service of process employed by the various nations of the world. This accommodation is necessary *in order to avoid* violating the sovereignty of other countries by committing acts within their borders that they may consider to be "official" and to maximize the likelihood that the judgment rendered in the action in this country will be recognized and enforced abroad.

J. Cound, et al., Civil Procedure: Cases and Materials 173 (2d ed. 1974) (emphasis added). *See also* Miller, *supra* note 66, at 1075–86.

The Reporter to the Advisory Committee on the Civil Rules at the time rule 4(i) was adopted has further verified this concern for the territorial sovereignty of foreign countries which led to adoption of the rule. *See* Kaplan, *Amendments of the Federal Rules of Civil Procedure, 1961–1963(I)*, 77 Harv.L.Rev. 601, 635–36 (1964). *See also* Smit, *International Aspects of Federal Civil Procedure*, 61 Colum.L.Rev. 1031, 1047 (1961).

**75.** *See* note 74 *supra.*

**76.** *Cf. Ings v. Ferguson*, 282 F.2d 149, 152 (2d Cir. 1960) (when foreign procedure for subpoena service exists in a foreign country, the parties should use that procedure rather than running the risk of violating foreign law).

**77.** *See* note 18 *supra.*

**78.** Restatement (Second) of Foreign Relations Law of the United States §§ 6–7 (1965) [hereinafter Restatement (Second)]. For a discussion of a third type of jurisdiction, adjudicative jurisdiction, *see* notes 97–105 and accompanying text *infra.*

**79.** *See id.* at § 6, comment a.

**80.** *Id.*

law imposes different limitations upon a state's exercise of its jurisdiction, depending upon whether the jurisdiction exercised is prescriptive or enforcement jurisdiction.[81]

■ Traditionally, a state has plenary power to *prescribe* rules within its own territorial boundaries.[82] Conversely, under traditional principles of absolute territoriality, "[the laws of a nation] can have no force to control the sovereignty or rights of any *other* nation within *its* own jurisdiction."[83] Over time these rigid principles have yielded to certain exceptions. Thus, the current Restatement recognizes that a state has prescriptive jurisdiction not only over conduct, things, status or interests *within* its territory,[84] but also over conduct outside its territory which has or is intended to have substantial effects within its territory[85] as well as conduct of its nationals even when they are outside its borders.[86]

■ When an American court orders enforcement of a subpoena requiring the production of documents and threatens penalties for noncompliance with that subpoe-

na, it invokes the *enforcement jurisdiction*, rather than the prescriptive jurisdiction, of the United States.[87] The two types of jurisdiction are not geographically coextensive —"[a] state having jurisdiction to prescribe a rule of law does not necessarily have jurisdiction to enforce it in all cases,"[88] for unlike a state's prescriptive jurisdiction, which is not strictly limited by territorial boundaries, enforcement jurisdiction by and large continues to be strictly territorial.[89] The Restatement illustrates this disjunction with the following hypothetical:

> X is a national of state A residing in state B. A has *jurisdiction to prescribe* a rule subjecting X to punishment if he fails to return to A for military service. X does not return. A has *no jurisdiction to enforce* its rule by action against X in the territory of B.[90]

■ If a state should enforce a rule which it does not have jurisdiction to enforce, it violates international law, thus giving rise to a claim by the state adversely affected which may then be adjudicated in

---

**81.** *Id.* at §§ 6–7.

**82.** *The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 136, 3 L.Ed. 287 (1812) (Marshall, C.J.) ("The jurisdiction of the nation, within its own territory, is necessarily exclusive and absolute").

**83.** *The Appollon*, 22 U.S. (9 Wheat.) 362, 370, 6 L.Ed. 111, 112 (1824) (Story, J.) (emphasis added).

**84.** Restatement (Second) § 17.

**85.** *Id.* at § 18. This is the so-called "effects doctrine." *See, e. g., United States v. Aluminum Co. of America*, 148 F.2d 416, 444 (2d Cir. 1945) (agreements made abroad between foreigners may violate Sherman Antitrust Act if "intended to affect imports and did affect them"). *See also The S.S. Lotus*, note 67 *supra* (criminal offenses committed by perpetrators in another state's territory may be regarded as committed in the national territory if the effects of the offense are felt in the national territory).

**86.** Restatement (Second) § 30.

**87.** *See* text accompanying note 80 *supra*.

**88.** Restatement (Second) at § 7(1). *See generally* Mann, *Prerogative Rights of Foreign States and the Conflict of Laws*, 40 Transactions of the Grotius Soc'y 25, 46 (1954).

**89.** Restatement (Second) at § 20. For exceptions to this rule, *see id.* §§ 24–25 (jurisdiction conferred by agreement); § 32 (national forces, vessels, and aircraft); § 44(b) (consent by the territorial state).

> The problem of enforcement jurisdiction arises when a State acts in foreign territory itself or at least *takes measures which, though initiated in its own territory, are directed towards consummation, and require compliance, in the foreign State . . .*
>
> It is in line with the difference in the nature of the problems that entirely different legal principles govern legislative and enforcement jurisdiction respectively. A State which *actually attempts to give effect to its legislation in the territory of another State comes into conflict with the latter's sovereignty.* The problems of enforcement jurisdiction, therefore, fail to be considered exclusively from the point of view of the international rights of that State in which the enforcement takes place or is intended to take place.

Mann, *The Doctrine of Jurisdiction in International Law*, 1 Rec. Des Cours 1, 128 (1964) (emphasis added).

**90.** Restatement (Second) § 7, illustration 1 (emphasis added).

an appropriate international forum.[91] This would be true even if the state had jurisdiction to prescribe the rule in the first place.

Again, the Restatement provides a clear illustration of how such a claim might arise:

X, a national of state A, kills a man in the territory of state B, and escapes to A. Public officers of B seize X in the territory of A and bring him back to B for trial. B has *jurisdiction to prescribe* criminal rules dealing with the conduct of X but *no jurisdiction to take enforcement action in the territory of A.* A has a claim against B under the rule (of international law) stated in this Section.[92]

◼ Similarly, the *district court's enforcement order* here violates the above principles of international law—not because the United States lacks *jurisdiction to prescribe* rules relating to the antitrust matters under investigation, but because the court's order represents an attempt by the U. S. to exercise its *enforcement jurisdiction* within foreign territory *before* its prescriptive jurisdiction over the investigated conduct has been proved to exist.

More than a decade ago, one commentator analyzed a situation identical to the one before us, under principles of international law, in the form of a hypothetical problem:

[Suppose a] court orders aliens to produce documents both located abroad and related to their business activities abroad. The only valid basis of legislative [pre-

scriptive] jurisdiction which could be invoked is the . . . [so-called] "effects doctrine." It must be proved that the commercial activities engaged in abroad had a harmful effect on the economy in the forum country. When a court, however, orders the production of documents, it is still in its investigatory stage. The documents are needed to prove the effects. *Hence, the order is made before there is a finding as to whether or not effects exist. This means that the order is issued before legislative jurisdiction is proved to exist.* Consequently, this would be an exercise of enforcement jurisdiction without legislative jurisdiction and, thus, contrary to international law.[93]

Two separate conferences of the International Law Association have also studied this problem and reached the same conclusion—that the district court's proposed enforcement of the administrative subpoena, by compelling the conduct in France of French nationals, would violate international law. The Fifty-First Conference, held in Tokoyo, initially concluded that:

It is difficult to find any authority under international law for the issuance of orders compelling the production of documents from abroad. The documents are admittedly located in the territory of another State. To assume jurisdiction over documents located abroad *in advance of a finding of effect upon commerce* raises the greatest doubts among

---

91. Restatement (Second) §§ 8, 3(1).

92. Restatement (Second) § 8, illustration 4 (emphasis added).

93. Onkelinx, *Conflict of International Jurisdiction: Ordering the Production of Documents in Violation of the Law of the Situs,* 64 Nw.U.L. Rev. 487, 498–99 (1969) *(emphasis added)* [hereinafter Onkelinx].

This reasoning can perhaps be better understood within the context of our federal system. If a state regulatory agency analagous to the FTC—for example, the New York State Consumer Protection Agency—wanted to compel the appearance, testimony, and production of documents by a California corporation at one of its proceedings, it could issue compulsory process to assist its investigation. Clearly, the

New York state legislature would have prescriptive jurisdiction to authorize its Consumer Protection Agency to *investigate* those activities of out-of-state companies which affect New York commerce. Furthermore, the legislature would have prescriptive jurisdiction to specify the *penalties* to be imposed upon such companies for any violations of New York unfair trade practice laws.

Yet the existence of New York's *prescriptive* jurisdiction over the out-of-state conduct harmful to New York commerce would in no way confer upon the New York courts jurisdiction to enforce, in California, particular subpoenas served upon *particular* West Coast companies, until some showing could be made that their activities had harmful effects in New York.

non-Americans as to the validity of such orders.[94]

The Fifty-Second Conference of the International Law Association, held in Helsinki, went on to draw a clear distinction between the type of production ordered in *DeSmedt*[95] and the type ordered here:

[T]he basic principle is that the jurisdiction to order production of documents must be *commensurate with the limits of the legislative [prescriptive] jurisdiction to regulate the matters to which the documents relate.* Thus, the true legal position will be as follows:

(1) Where a State requires a *local* branch [of a foreign company] to produce documents *relating to its own affairs*, the demand cannot be resisted merely because the documents are not within the jurisdiction or that they belong to a non-resident alien. A case may arise when the discovery is prohibited by his *lex situs* [the law of the residence of the alien and the documents]. In such case, each State is acting within its jurisdiction, the one in requiring production and the other in forbidding it, and a conflict arises.

. . . . .

(4) Where, however, a State proceeds against a local branch to *enforce the production of documents situate abroad and moreover relating to the affairs or to activities outside the jurisdiction of the head-office of the non-resident alien*, the requirement is only lawful if the enforc-

ing State has, in fact, substantive jurisdiction to enquire into those affairs and activities. A State abuses its powers if it uses the process of its courts to reach further than its legislative jurisdiction properly extends.[96]

By this analysis, the district court's enforcement of the FTC's subpoenas so served would clearly extend American enforcement jurisdiction beyond the limits of its prescriptive jurisdiction. As such, the district court's enforcement order violated a fundamental principle of international law.

### b. Types of Agency and Federal Court Jurisdiction Distinguished

When a state's jurisdiction to adjudicate,[97] as opposed to its enforcement or prescriptive jurisdiction, is at issue, questions of service of process, subject matter jurisdiction, and personal jurisdiction are invariably intertwined and hence, frequently confused. Before a federal court may adjudicate a controversy, it must possess jurisdiction over both the *subject matter* of the action and over the *persons* whose rights are to be affected by its determination.[98] Both types of jurisdiction are constitutionally limited. The subject matter jurisdiction of the federal courts depends totally upon congressional implementation of a constitutional grant of subject matter jurisdiction.[99] Furthermore, federal courts are subject to limits of personal jurisdiction—a court may not exercise its adjudicatory au-

---

94. Report of the Fifty-First Conference, International Law Association 403, 407 (Tokyo 1964) (emphasis added).

95. *See* notes 30–34 *supra* and accompanying text.

96. Report of The Fifty-Second Conference, International Law Association 109, 112 (Helsinki 1966) (emphasis added).

97. Jurisdiction to adjudicate, or "judicial jurisdiction", refers to a state's authority to subject persons or things to the process of its courts or administrative tribunals, usually for the purpose of rendering a judgment. Restatement (Second) of Conflict of Laws 2d §§ 24–26 (1971).

While never renowned as a legal scholar, President Andrew Jackson epigrammatically caught the distinction between jurisdiction to enforce and jurisdiction to adjudicate when he said: "John Marshall has made his decision; now let him enforce it!" H. Hockett, Political and Social Growth of the United States (1492–1852) at 502 (1937); M. James, The Life of Andrew Jackson: Portrait of a President 603 (1937). This remark was made in regard to Chief Justice Marshall's decision in *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832).

98. *Louisville & Nashville R. R. v. Mottley*, 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908); *Pennoyer v. Neff*, 95 U.S. 714, 24 L.Ed. 565 (1877).

99. *Hodgson & Thompson v. Bowerbank*, 9 U.S. (5 Cranch) 303, 3 L.Ed. 108 (1809).

thority over an individual unless it has *power* to reach him, as circumscribed by the due process clause of the Constitution.[100] Under modern doctrine,[101] due process is not satisfied unless the defendant has sufficient "minimum contacts" with the forum such that the maintenance of a lawsuit against him in that forum does not offend "traditional notions of fair play and substantial justice." [102] Procedural due process further requires that a court not exercise its adjudicatory authority over a person, even when it has the power to do so, unless that person has been given adequate *notice* and *opportunity to be heard*.[103] Thus a court may lack personal jurisdiction over an individual either because it is powerless to affect his rights or because it has failed to give him proper notice that his rights are at issue.

■ If properly accomplished, service of process confers personal jurisdiction upon a court to adjudicate the rights of a party.[104] When as here, the issue is the propriety of a particular *technique* of serving a particular *type* of process, however, neither subject matter jurisdiction nor personal jurisdiction—in either the "power" or the "notice" sense—is directly at issue.[105] The basic inquiry here is thus whether the district court's enforcement order should be vacated because the *manner* used by the agency to serve its subpoena was unauthorized by, or

in in some other way obnoxious to, domestic or international law.

The district court, however, apparently viewed the central issue in the case as whether or not the power of the FTC to serve process abroad could validly be inferred from its broad investigatory and regulatory jurisdiction.[106] The court read *Blackmer v. United States* [107] as "unequivocally conclud[ing] that the lawful exercise of jurisdiction confers the authority to effect service."[108] It then postulated that since the *Blackmer* Court had upheld Congress' power expressly to authorize issuance of subpoenas abroad, it must have also approved Congress' power to secure service of those subpoenas. By delegating its subpoena power to the FTC, the district court concluded, Congress by implication must have delegated to the agency authority to effect subpoena service in any permissible manner.[109]

Such an analysis fundamentally misreads the Supreme Court's jurisdictional findings in *Blackmer*, as a review of the history of that case will demonstrate. Upon discovery of the Teapot Dome scandal in 1923, a number of the prominent Americans involved, among them Harry Blackmer, fled to France. To compel their testimony in the subsequent criminal proceedings, Congress passed the Walsh Act [110] authorizing the

**100.** *Pennoyer v. Neff*, 95 U.S. 714, 24 L.Ed. 565 (1877).

**101.** Traditionally, the defendant's presence within the territorial jurisdiction of a particular court and service upon that defendant *within that territory* were considered necessary and sufficient to satisfy due process. *Id.*

**102.** *Shaffer v. Heitner*, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977); *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

**103.** *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950); *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972).

**104.** Although questions of service of process, jurisdiction, and venue often are closely intertwined, service of process is merely the *means* by which the court, having a sufficient basis for jurisdiction and venue, *asserts them over the*

*party* and affords him *due notice* of the commencement of the action.

4 C. Wright & A. Miller, 1083, at 335 note 61 *supra* (emphasis added).

**105.** *Cf. National Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 84 S.Ct. 411, 11 L.Ed.2d 354 (1964) (discussing technique of service of process).

**106.** *See* notes 41–48 *supra* and accompanying text.

**107.** 284 U.S. 421, 52 S.Ct. 252, 76 L.Ed. 375 (1932).

**108.** *FTC v. Compagnie De Saint-Gobain-Pont-A-Mousson*, 493 F.Supp. 286, 293 (D.D.C.1980).

**109.** *Id.* at n.4.

**110.** 28 U.S.C. § 711–18 (1926) (current version at 28 U.S.C. §§ 1783–84 (1976)). For the full

federal district courts to compel the attendance of American witnesses abroad in connection with domestic criminal proceedings. The statute expressly authorized service of judicial subpoenas outside the United States and specified the means of service to be employed.[111] Pursuant to the Act, the Supreme Court of the District of Columbia issued a subpoena which was served upon Blackmer in the statutorily authorized fashion, requiring Blackmer to appear as a witness at a criminal trial. When Blackmer failed to respond, he was found in contempt of court. The U. S. Supreme Court affirmed the contempt conviction and upheld the statute against a due process attack solely on the grounds that Blackmer "was, and continued to be, a citizen of the United States." [112]

The *Blackmer* Court found the statute consistent with both the Constitution and international law for two reasons. With respect to the exercise of the United States' *prescriptive* authority over Blackmer, the Court found "there is no question of international law, but solely of the purport of the municipal law which establishes the duties of the citizen in relation to his own government," namely, the duty "which the citizen owes to his government . . . to support the administration of justice by attend-

ing its courts and giving his testimony whenever he is properly summoned." [113] With respect to the exercise of the United States' *adjudicative* authority over Blackmer, the Court held that the trial court's authority to give Blackmer constitutionally required *notice* was a necessary adjunct of its judicial *power* over him, which in turn was independently based upon the contact provided by his American citizenship.[114]

 Upon examination, this case bears little resemblance to *Blackmer*. In *Blackmer*, the primary question was one of *personal jurisdiction:* whether Blackmer's American citizenship provided a sufficient basis for the court's assertion of its adjudicatory power over him.[115] The witness did not challenge the subject matter jurisdiction of the court; Congress had by statute explicitly delegated to the court the authority to issue its subpoenas abroad as part of its general jurisdiction to adjudicate. Nor did *Blackmer* question whether Congress had authorized the particular *technique* of service employed. In the Walsh Act, Congress had clearly stated its intent to equip courts with a means by which to serve American witnesses abroad to procure their attendance in criminal proceedings.[116] Thus

text of that Act, *see Blackmer v. United States*, 284 U.S. 421, 433–35 n.1, 52 S.Ct. 252, 253 n.1, 76 L.Ed.2d 375 (1932). The Walsh Act was amended in 1948, *see* Reviser's Note, 28 U.S.C.A. § 1783 (1966), and again in 1964, Pub.L. No. 88–619, §§ 10–11, 78 Stat. 997–98, 28 U.S.C. §§ 1783–84 (Supp.1964). As amended, the Act authorizes an American court to issue a subpoena to

> a national or resident of the United States who is in a foreign country . . . if the court finds that particular testimony or the production of the document or other thing by him is necessary in the interest of justice, and, in other than a criminal action or proceeding, if the court finds, in addition, that it is not possible to obtain his testimony in admissible form without his personal appearance or to obtain the production of the document or other thing in any other manner.

28 U.S.C. § 1783 (1976).

**111.** *See Blackmer v. United States*, 284 U.S. 421, 434–35, 52 S.Ct. 252, 253–54, 76 L.Ed. 375 (1932).

**112.** *Id.* at 436, 52 S.Ct. at 254.

**113.** *Id.* at 437–38, 52 S.Ct. at 254–55.

**114.** "The jurisdiction of the United States over its absent citizen, so far as the binding effect of its legislation is concerned, is a jurisdiction *in personam*, as he is personally bound to take notice of the laws that are applicable to him and to obey them." *Id.* at 438, 52 S.Ct. at 255. The *Blackmer* Court specified, however, that, [t]he instant case does *not* present the questions which arise in cases where obligations inherent in [national] allegiance are not involved." *Id.* at 438 n.5, 52 S.Ct. at 255 n.5 (emphasis added).

**115.** *Id.* at 436, 52 S.Ct. at 254.

**116.** 28 U.S.C. § 1783, as amended to codify the *Blackmer* holding, expressly limited the authority of the federal courts to issue subpoenas to "national[s] or resident[s] of the United States . . . in a foreign country." *See* note 110 *supra*. Because the Walsh Act had been interpreted in *Blackmer* as an exercise of American power *over its own citizens*, the Act has never been read as permitting issuance of a subpoena to an

the only question of international law discussed in *Blackmer* was whether Congress, by enacting the Walsh Act, had exceeded its prescriptive jurisdiction.[117]

Here, by contrast, the primary questions are those of *subject matter jurisdiction* and *technique of service.* At the time of service, Congress had explicitly conferred subject matter jurisdiction on the agency to investigate conditions which may affect America's foreign trade, but it had *not* explicitly delegated to the agency any authority to serve its subpoenas on foreign citizens abroad.[118] In *Blackmer*, the congressional intent regarding the proper method of service was unmistakable; here, it is precisely the congressional intent with respect to technique of service which is in dispute.

In direct contradistinction to *Blackmer*, in this case the *personal jurisdiction* of both the district court and the agency over the respondent is not at issue: the court has secured personal jurisdiction over the respondent by proper service of process and, misguidedly or not, the respondent has conceded that the documents being sought are subject to the personal jurisdiction of the agency.[119] The relevant issues under international law, therefore, are whether the FTC has properly served its subpoena and whether the court exceeded its enforcement jurisdiction by enforcing that subpoena.

alien residing outside the United States. *See, e. g., Gillars v. United States*, 182 F.2d 962 (D.C. Cir. 1950) ("Aliens who are inhabitants of a foreign country cannot be compelled to respond to a subpoena. They owe no allegiance to the United States," *citing United States v. Best*, 76 F.Supp. 138, 139 (D.Mass.1948)); Gallagher, *Subpoena Service on Citizens Residing Abroad*, 12 Int'l Law. 563 (1978) (discussing *Blackmer*).

Although the Walsh Act was again amended in 1964 to provide for subpoena service "in accordance with the provisions of the Federal Rules of Civil Procedure relating to service of process on a person in a foreign country," including registered mail, the express purpose of the amendment was to "substantially *enhance* the probability that the service can be made without offending the sensibilities of foreign sovereigns." Smit, *International Litigation Under the United States Code*, 65 Colum.L. Rev. 1015, 1038 (1965) (emphasis added). *Compare* notes 73–75 *supra* (discussing policy underlying rule 4(i)). *See also* Smit, *International Aspects of Federal Civil Procedure*, 61 Colum.L.Rev. 1031, 1047 (1961).

117. The *Blackmer* Court's resolution of that issue did not, therefore, dispose of the question here. The fact that a state has prescriptive jurisdiction over a certain type of conduct does not necessarily validate every method by which that state may choose to serve compulsory process for the purposes of investigating that conduct. This is clear even within the boundaries of the United States. If the hypothetical New York regulatory agency described in note 93 *supra* wanted to compel the appearance of or production of documents by a California corporation in an investigation of that corporation's anticompetitive activities, it would still have to take heed of possible infringements upon California state sovereignty resulting from its use of a particular mode of serving its

compulsory process. New York's prescriptive jurisdiction over the anticompetitive conduct in question would not validate service of compulsory process by registered mail, for example, given the requirement of personal service of subpoenas found in the Federal Rules of Civil Procedure. *See* notes 63–64 *supra* and accompanying text.

118. *See* text accompanying note 124 *infra*. *But see* note 140 *infra*.

119. We assume that just as a court may not validly exert its adjudicative authority over a defendant lacking "minimum contacts" with the forum, *see* notes 100–02 *supra* and accompanying text, the FTC is subject to some limitations on its personal jurisdiction—set by the due process clause of the Constitution—which bar it from exercising its investigative authority over a foreigner lacking any contacts with the United States.

For reasons that remain unclear, however, respondent here has repeatedly conceded the FTC's power to issue an investigatory subpoena directed at obtaining the *particular documents* sought in this investigation. *See* Transcript of Oral Argument *FTC v. Compagnie De Saint-Gobain-Pont-A-Mousson* at 14, 30–31, No. 78-2160 (D.C. Cir. 26 Nov. 1979).

Thus, in our memorandum opinion remanding the record to the district court, we noted that:

Appellant did not urge, either upon this court or the District Court, that documents located abroad were beyond the reach of the Commission's subpoena authority. Indeed, its actions in the District Court, and its representations on appeal, assume the contrary. It rather has insisted only that service of any subpoena directed at documents abroad could lawfully be made only in the United States.

The district court chose to answer the question of the propriety of the FTC's method of service by reference to the agency's *subject matter* jurisdiction.[120] Thus, the district court derived the agency's specific authority to serve its subpoena abroad in the manner chosen not from any federal statute, but solely by implication from the agency's general investigatory and regulatory jurisdiction. In view of the prevailing principles of international law opposing that mode of service,[121] we will examine whether such an implication was warranted.

### C. The Appropriate Interpretation of Congressional Intent Regarding FTC Subpoena Service

In the Federal Trade Commission Act, Congress empowered the FTC "to prevent persons, partnerships, or corporations . . . from using unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce."[122] The Act went on to define commerce to include both interstate and international commerce;[123] furthermore, the Commission was statutorily empowered to gather and compile information and

> [t]o investigate, from time to time trade conditions in and with foreign countries where associations, combinations, or practices of manufacturers, merchants or traders, or other conditions, may affect the foreign trade of the United States . . .[124]

Courts have customarily granted broad deference to an agency's own initial determination of the scope of its investigatory authority.[125] Indeed, there can be little doubt that when the FTC has sought to carry out its statutory mandate *within* the borders of the United States, the federal courts have chosen to construe its subpoena powers very broadly.[126]

■ It is essential to bear in mind, however, the distinction between the narrow issue addressed in this case—namely, the validity of the method of subpoena service actually employed by the FTC—and the larger question of the FTC's authority to investigate both domestic and foreign corporations whose actions have harmful effect on U.S. commerce. Clearly, the FTC has subject matter jurisdiction to investigate and regulate any of respondent's activities which affect United States commerce. Yet the fact of this broad subject matter jurisdiction in no way warrants the presumption that the FTC can use any *technique* to serve a subpoena compelling a foreign company residing abroad to produce live witnesses and documents.[127]

■ Liberal judicial interpretations of agency power are not justified when agency action threatens to have extraterritorial, rather than merely national, impact. In *Foley Bros. v. Filardo*, the Supreme Court stated:

> The canon of construction which teaches that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States . . . is a valid approach whereby unexpressed congressional intent may be ascertained.[128]

---

**120.** *See* notes 41–46 *supra* and accompanying text.

**121.** *See* Parts B.1 & B.2 *supra*.

**122.** 15 U.S.C. § 45(a)(6) (1976).

**123.** 15 U.S.C. § 44 (1976).

**124.** 15 U.S.C. § 46(h) (1976).

**125.** *See, e. g., Endicott Johnson Corp. v. Perkins,* 317 U.S. 501, 63 S.Ct. 339, 87 L.Ed. 424 (1943); *Oklahoma Press Publishing Co. v. Walling,* 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946).

**126.** *See, e. g., FTC v. Browning,* 435 F.2d 96, 99–100 (D.C. Cir. 1970); *Hunt Foods & Indus. Inc. v. FTC,* 286 F.2d 803 (9th Cir. 1960), *cert. denied,* 365 U.S. 877, 81 S.Ct. 1027, 6 L.Ed.2d 190 (1961).

**127.** For the distinction between subject matter jurisdiction and technique of service, *see* notes 97–105 and accompanying text *supra*.

**128.** 336 U.S. 281, 285, 69 S.Ct. 575, 577, 93 L.Ed. 680 (1949). *See also* Restatement (Second) § 38.

Furthermore, as we noted in our original opinion ordering remand,[129] courts are bound wherever possible to construe strictly federal statutes conferring subject matter jurisdiction on domestic agencies to avoid possible conflicts with contrary principles of international law.[130]

■ The reverse side of this general canon of statutory construction, of course, is that courts of the United States are nevertheless obligated to give effect to an unambiguous exercise by Congress of its jurisdiction to prescribe even if such an exercise would exceed the limitations imposed by international law.[131] Given the plain intrusion upon French national sovereignty resulting from the FTC's direct service of its compulsory process abroad [132] and the violation of international law which would result if the district court were to enforce the subpoena here,[133] the only issue is whether the provisions which governed subpoena service within the FTC Act at the time of the challenged service could have

been sensibly construed so as to avoid conflict with international law.

■ In view of the international interests at stake, we suggest that, at the time of service, the best reading of congressional intent with regard to permissible modes of subpoena service was one authorizing the FTC to use all customary and legitimate methods of service of compulsory process commonly employed by American courts and administrative tribunals.[134] Such a reading would have imposed the requirement of personal service found in Federal Rule of Civil Procedure 45(c), governing permissible methods of subpoena service by a federal court,[135] upon FTC subpoenas as well. It would have further required that wherever possible, an agency attempting subpoena service on foreign citizens residing on foreign soil should make initial resort through established diplomatic channels or procedures authorized by international convention.[136]

---

**129.** *See FTC v. Compagnie De Saint-Gobain-Pont-A-Mousson*, No. 78–2160, mem. op. at 2 (D.C. Cir. 26 Nov. 1979).

**130.** *See Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 61, 116 (1804) ("[A]n act of congress ought never to be construed to violate the law of nations, if any other possible construction remains. . . .")

This principle has been adopted by this Circuit. *See Pacific Seafarers, Inc. v. Pacific Far East Line, Inc.*, 404 F.2d 804, 814 (D.C. Cir.), *cert. denied*, 393 U.S. 1093, 89 S.Ct. 872, 21 L.Ed.2d 784 (1968):

[I]t may fairly be inferred, in the absence of clear showing to the contrary, that Congress did not intend an application that would violate principles of international law.

**131.** *See* Restatement (Second) § 38, Reporters' note 1.

**132.** *See* Part B.1 *supra.*

**133.** *See* Part B.2.a *supra.*

**134.** We cannot ignore the fact that the scope of administrative agency investigatory and regulatory jurisdiction has expanded enormously since the FTC Act was enacted in 1914. Yet it seems reasonable, when construing a statute potentially in conflict with international law, to assume that legislation enacted when U.S. government regulation was less pervasive is less likely than more recent legislation to reflect a congressional intent to have effect outside the nation's borders.

**135.** Fed.R.Civ.P. 45(c) provides:

A subpoena may be served by the marshal, by his deputy, or by any other person who is not a party and is not less than 18 years of age. Service of a subpoena upon a person named therein shall be made by delivering a copy thereof to such person and by tendering to him the fees for one day's attendance and the mileage allowed by law. When the subpoena is issued on behalf of the United States or an officer or agency thereof, fees and mileage need not be tendered.

**136.** The Hague Convention, note 69 *supra*, establishes standard procedures for service of judicial and extrajudicial documents in the territory of one contracting nation in aid of private commercial or civil litigation taking place in another contracting nation. For a discussion of the Hague Convention, *see generally* Amram, *Report on the Tenth Session of the Hague Conference on Private International Law*, 59 Am. J. Int'l L. 87, 90–91 (1965); Nadelmann, *The United States Joins the Hague Conference on Private International Law, A History with Comments*, 30 Law & Contemp. Prob. 291, 309–10 (1965) France is a signatory of the Convention.

In addition, both the United States and France have participated in a more recent effort to facilitate the process of obtaining evidence abroad—The Multilateral Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, *done* 18 March 1970, [1972] 23

To interpret the congressional intent underlying the FTC Act as authorizing methods of agency subpoena service abroad less rigorous than the means used to serve judicial subpoenas domestically have run counter to common intuition. To illustrate, if a civil litigant sought to subpoena a California corporation to appear and produce documents in a Washington, D.C. federal court proceeding, that litigant would, under the Federal Rules, be required to have his subpoena delivered in person by a United States marshal or another responsible adult.[137] Were the litigant simply to send the subpoena by registered letter to the corporation's principal offices in California, and the corporation were to resist compliance, the Washington, D.C. district court would refuse to enforce the subpoena. Even if the district court had personal jurisdiction over the foreign corporation, based upon the existence of minimum contacts between the corporation and the District of Columbia, and even if the witness had received actual notice of the proceeding, the improper technique of service employed would cause the court to refrain from citing the recalcitrant witness for contempt. In accordance with rule 45, the district judge would direct the litigant to obtain personal service upon the witness in California, or alternatively, to serve the corporation's agent in Washington, D.C.[138] We cannot imagine that when Congress enacted the FTC Act in 1914 it could have intended an administrative agency such as the FTC to procure witnesses and documents from abroad by means which no civil litigant had ever been able to employ within the borders of the United States. Nor can we imagine that Congress originally intended that the federal courts exercise their enforcement powers to aid administrative agency investigations initiated by registered mail, without making provision for the inevitable infringements upon foreign sovereignty which would result from such exercises.[139]

Should the FTC be able to obtain personal service upon the president, an officer, or a director of SGPM within the territorial boundaries of the United States, it could validly obtain a judicial enforcement order for that subpoena. Furthermore, we take judicial notice of a recent congressional amendment to the FTC Act, enacted *after* the subpoena challenged here issued, which apparently gives the FTC *express authority* to serve its civil investigative demands upon "any person who is not found within the territorial jurisdiction of any court of the

U.S.T. 2555, T.I.A.S. No. 7444, of which the Convention on Serving Judicial Documents is revised chapter 1.

Even if the Hague Convention does not apply to service by a United States government agency, *see* First Affidavit of Professor Covey T. Oliver, *attached to* SGPM Brief on Remand, at 5–6; Second Affidavit of Professor Pierre Mayer, *attached to* SGPM Brief on Remand, at 9, service by some other channel mutually acceptable to both governments is not precluded. *See, e. g., Tamari v. Bache & Co. (Lebanon),* 431 F.Supp. 1226 (N.D.Ill.) aff'd, 565 F.2d 1194 (7th Cir. 1977), *cert. denied,* 435 U.S. 905, 98 S.Ct. 1450, 55 L.Ed.2d 495 (1978).

137. *See* Fed.R.Civ.P. 45(c), *cited in full* at note 135 *supra.*

138. *See, e. g.,* In re *Equitable Plan Co.,* 185 F.Supp. 57 (S.D.N.Y.), *mod. sub nom. Ings v. Ferguson,* 282 F.2d 149 (2d Cir. 1960) (permitting such a mode of service).

139. *See* note 69 *supra.*
Such a reading of congressional intent would have seemed flatly inconsistent with American

diplomatic efforts to create regularized intergovernmental channels of international judicial assistance which enable government authorities to seek evidence abroad with a minimum of infringement on national sovereignty. *See generally* H. Smit & A. Miller, International Cooperation in Civil Litigation—A Report on the Practices and Procedures Prevailing in the United States (1961); Jones, *International Judicial Assistance: Procedural Chaos and a Program for Reform,* 62 Yale L.J. 515 (1953); Note, *Taking Evidence Outside of the United States,* 55 B.U.L.Rev. 368 (1975).

It is worth noting that although the French government sent a note of protest to the United States State Department on 10 January 1980 with regard to the FTC's attempt to serve its compulsory process by mail, *see* note 18 *supra,* as of this writing, the Department has yet to respond to the French protest. It seems likely that the State Department has found it difficult to defend the FTC's willingness to circumvent established international channels for delivering its compulsory process.

United States, *in such manner as the Federal Rules of Civil Procedure prescribe for service in a foreign nation."* [140] Because we are concerned here solely with interpreting the congressional intent underlying the FTC Act *as it existed at the time of the challenged service,* we need not express any opinion at this time as to whether the FTC could *now* lawfully serve its compulsory process abroad by registered mail as a civil investigative demand governed by the terms of the amended provision. We note only that, even if expressly authorized by statute, such a mode of service might still be subject to a due process attack if the witness so served both refused to concede the personal jurisdiction of the agency and lacked the requisite minimum contacts with the United States.[141] Furthermore, under

the principles of international law discussed above, such a manner of statutory service might still violate international law.[142]

■ Even if the agency could accomplish proper service by the means we have described, the issue of whether it could actually obtain the documents in question is far from settled. Proper service of the FTC's subpoena would merely create an obligation upon SGPM *under American law* to furnish the documents. The zeal with which American litigators have recently engaged in antitrust discovery abroad and the willingness of American courts to order production of foreign documents have not only triggered international controversy [143] and academic debate; [144] they have prompted passage of a fresh wave of foreign non-dis-

---

**140.** *See* the new section 20(c)(6)(B) of The FTC Act, governing civil investigative demands, added by § 13 of The Federal Trade Commission Improvements Act of 1980, Pub.L.No. 96–252, 94 Stat. 381 (*enacted* 28 May, 1980) (emphasis added). We have become aware of the passage of these amendments without the assistance of counsel for either the FTC or SGPM. These amendments replace the FTC's subpoena authority in certain Commission consumer protection investigation cases with C.I.D. authority virtually identical to that conferred upon the Justice Department by the Antitrust Civil Process Act, 15 U.S.C. 1312(d)(2) (1976). Ironically, these amendments to the FTC Act were viewed by the Senate as *limiting* rather than expanding the FTC's authority to conduct its investigations. *See* S.Rep.No. 96–500, 96th Cong., 1st Sess. at 23–26 (1979). Since these amendments obviously apply only prospectively, they do not affect our analysis of the invalidity of the mode of service employed in this case. If anything, the passage of these amendments buttresses the argument already made, for it indicates that when Congress intends to authorize extraterritorial service of investigative subpoenas, it will express that intent explicitly.

**141.** *See* note 119 *supra.*

**142.** See Part B.1 *supra.*

**143.** *See, e. g.,* the reaction of the British House of Lords to American government support of Westinghouse's efforts to take the testimony of British witnesses to an alleged uranium price-fixing conspiracy. *Rio Tinto Zinc Corp. v. Westinghouse Elec. Corp.,* [1978] 2 W.L.R. 81 (House of Lords). For a discussion of the controversy stimulated by the ongoing Westinghouse litigation, In re *Westinghouse Elec. Corp.*

*Uranium Contracts Litigation (Rio Algom),* 563 F.2d 992 (10th Cir. 1977), *see generally* Mehrige, *The Westinghouse Uranium Case: Problems Encountered in Seeking Foreign Discovery and Evidence,* 13 Int'l Law. 19 (1979).

One commentator, remarking upon the plethora of governmental protests which followed a U. S. district court's order to produce documents almost three decades ago, In re *Investigation of World Arrangements,* 13 F.R.D. 280 (D.D.C.1952), stated:

> From the many protests against the attempts of United States courts to secure documents which are located abroad, one thing seems quite clear: every foreign government considers this attempt as an infringement upon its sovereignty and as beyond the jurisdiction of the United States according to international law.

Onkelinx, *supra* note 93, at 499.

**144.** *See, e. g.,* Onkelinx, *supra* note 93; Note, *Foreign Non-disclosure Laws and Domestic Discovery Orders in Antitrust Litigation,* 88 Yale L.J. 612 (1979) [hereinafter Yale Note]; Note, *Discovery of Documents Located Abroad in U. S. Anti-trust Litigation: Recent Developments in the Law Concerning the Foreign Illegality Excuse for Non-Production,* 14 Va. J. Int'l L. 747 (1974) [hereinafter Virginia Note]; Note, *Ordering Production of Documents from Abroad in Violation of Foreign Law,* 31 U.Chi. L.Rev. 791 (1964); Note, *Limitations on the Federal Judicial Power to Compel Acts Violating Foreign Law,* 63 Colum.L.Rev. 1441, 1458–65 (1963); Note, *Subpoena of Documents Located in Foreign Jurisdiction where Law of Situs Prohibits Removal,* 37 N.Y.U.L.Rev. 295 (1962).

closure laws as well.[145] Indeed, since the instant litigation began, the French government has enacted a statute which would not only subject SGPM to criminal and monetary penalties for producing the documents sought here,[146] but would also potentially subject the FTC to criminal penalties under French law merely for "ask[ing] for . . . information of an economic, commercial, industrial, financial or technical nature that may constitute proof with a view to legal or administrative proceedings in another country."[147] Though we express no view here as to whether SGPM's noncompliance with a properly served subpoena would be excused in light of the French statute[148] the potentially dire consequences of properly obtained service for *both* the agency and

**145.** At the close of 1979, six foreign states and two Canadian provinces had enacted "blocking statutes," designed to protect their citizens against official inquiries by authorities of other states. Yale Note at 613 nn.5–6. Foreign nondisclosure statutes have been of two types—the first, providing that a government official may, in his discretion, prohibit the production of a class of documents, *see, e. g.*, Foreign Proceedings (Prohibition of Certain Evidence Act), 1976, Austl. Acts No. 121, § 5, and the second, prohibiting production of *any* documents requested by a foreign tribunal unless those documents are of a type normally sent out of the province in the regular course of business, *see, e. g.*, Business Concerns Records Act, 1964, Que.Rev.Stat. c. 278 (1964).

The British legislature has recently enacted legislation of the first type, *see* Protection of Trading Interests Act, 1980, c. 11 § 2, 20 Mar. 1980, while the French government has promulgated in the last few months legislation of the second type, *see* notes 146–47 *infra*.

**146.** French Law No. 80–538, titled "Law concerning the communication of documents or information of an economic, commercial, industrial, financial or technical nature to aliens, whether natural or artificial persons," provides in Article 1:

Without prejudice to international treaties or agreements, a natural person of French nationality or customarily residing on French territory, or *director, representative, agent or official of an artificial person with headquarters or an establishment on French territory, shall not communicate* in writing, orally, or in any other form, regardless of place, *to the public authorities of another country documents or information of an economic, commercial, industrial, financial or technical nature where such communication is liable to threaten France's sovereignty*, security or basic economic interests or the public order, as defined by the administering authority when necessary.

Journal Officiel de la Republique Francaise (17 July 1980) (translation provided by SGPM; uncontroverted by FTC) (emphasis added). Article 3 of that law further specifies:

Without prejudice to more serious penalties provided by law, any violations of articles 1 and 1a of this law shall be punishable

by two to six months' imprisonment and a fine of from 10,000 to 120,000 francs [$2,500 to $30,000] or either one of these two penalties alone.

*Id.*

**147.** Article 1a of the French statute provides:

Without prejudice to international treaties or agreements and to current laws and regulations, *a person shall not ask for*, seek or communicate in writing, orally, or in any other form, *documents or information of an economic, commercial, industrial, financial or technical nature that may constitute proof with a view to legal or administrative proceedings in another country* or in the framework of such proceedings.

*Id.* (emphasis added).

Thus, not only would the FTC's act of *delivering* its subpoena threaten French sovereignty, its *request* for the documents would itself constitute a *prima facie* violation of French law subject to enforcement by criminal penalties.

**148.** The district court would first have to determine whether the French statute was applicable to this subpoena (which issued prior to the passage of the French law) and to those subpoenaed documents which, though under the control of SGPM, may be within the territorial jurisdiction of the United States. Furthermore, the district court would have to consider whether SGPM had made good-faith efforts to secure the permission of the French government to produce the documents despite the French statute, and then weigh the respective interests of the United States and France. *See generally* Restatement (Second) § 39–40, *Societe Internationale v. Rogers*, 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958); In re *Westinghouse Elec. Corp. Uranium Contracts Litigation (Rio Algom)*, 563 F.2d 992, 997–99 (10th Cir. 1977). For detailed discussion of how district judges have traditionally made this determination, *see generally* Onkelinx, *supra* note 93; Yale Note, *supra* note 144; Virginia Note, *supra* note 144.

In view of the interpretation of French law which would be necessary, *see* notes 146–47 *supra*, a district court might see fit to defer to the judgment of a foreign court regarding the applicability of the law. *See, e. g., Ings v. Ferguson*, 282 F.2d 149, 152 (2d Cir. 1960).

the respondent influence our decision strictly to construe the congressional intent underlying the statutory provisions relevant here. Without granting undue deference to the mandate of foreign nondisclosure laws,[149] we note simply that where two constructions of a statute are possible, the one less likely to conflict directly with regulations of other nations should be chosen.[150]

## III. CONCLUSION

Finding the Commission's investigatory subpoena to be improperly served under the Federal Trade Commission Act, as we have construed it in conformity with general principles of international law, we order that the district court's enforcement orders of 29 September 1978 and 14 February 1980 be vacated and that the case be dismissed by the district court. The order of dismissal should also prescribe that all documents and copies submitted by SGPM to the FTC responsive to the improperly served subpoena be returned to SGPM within sixty days after entry of judgment, and that all notes, extracts, or other records derived from such documents be destroyed.

*So Ordered.*

McGOWAN, Circuit Judge, concurring separately.

I concur in the result. In doing so, however, I do not find it necessary to explore the jurisdictional distinctions and the intricacies of international law which bulk so large in the majority opinion.

This case was greatly simplified by the fact that no issue was presented with respect to the power of the Federal Trade Commission to compel the production by appellant corporation of documents located in the country of its nationality, France. The claim, rather, was only that the Com-

mission had not been clothed by Congress with the authority to serve its investigative subpoena by registered mail directed to appellant at its general corporate headquaters in Paris. Effective service of that subpoena, so it was argued by appellant, could only be made by personal service of it upon an officer or director of appellant within the United States.

The service of an investigative subpoena on a foreign national in a foreign country seems to me to be a sufficiently significant act as to require that Congress should speak to it clearly. I am not, therefore, prepared, as was the District Court, to infer the requisite authority from the breadth of Congress's power to reach foreign documents in the exercise of its power to regulate interstate and foreign commerce, or from a general delegation by Congress to the Commission of rulemaking authority.

In reaching this conclusion, I am impressed by the Congressional course of conduct in the area of providing for service of investigative demands abroad in the context of enforcement of our antitrust laws. For years it was apparently deemed necessary by the Department of Justice to serve its investigative demands upon officers or directors of foreign corporations found in the United States—as appellant concedes the Commission could have done in this case. In 1976, however, Congress acted to authorize the service of the Department's civil investigative demands on foreign nationals "in such manner as the Federal Rules of Civil Procedure prescribe for service in a foreign country." 15 U.S.C. § 1312(d)(2). Service by registered mail in a foreign country is encompassed in that grant of authority.

It is also quite significant, I believe, with respect to the issue of Congressional pur-

---

**149.** *See, e. g.,* In re *Chase Manhattan Bank,* 297 F.2d 611 (2d Cir. 1962) (Panamanian law); *First Nat'l City Bank v. IRS,* 271 F.2d 616 (2d Cir. 1959), *cert. denied,* 361 U.S. 948, 80 S.Ct. 402, 4 L.Ed.2d 381 (1960) (same).

**150.** Principles of international comity require that domestic courts not take action that may cause the violation of another nation's laws. *See* Note, *Ordering Production of Documents from Abroad in Violation of Foreign Law,* 31 U.Chi.L.Rev. 791, 794–96 (1964).

pose and intent now before us, that after this case was finally taken under submission on February 14, 1980, Congress enacted Public Law 96–252, effective May 28, 1980, the "Federal Trade Commission Improvements Act of 1980," which, among other things, gave to the Commission, in language virtually identical to that used in 1976 with respect to the Department of Justice, the same power to serve a civil investigative demand upon a foreign national abroad by registered mail.